[No. H027860. Sixth Dist. May 17, 2006.]

LOS ALTOS EL GRANADA INVESTORS, Plaintiff and Appellant, v. CITY OF CAPITOLA et al., Defendants and Respondents.

## COUNSEL

Hart, King & Coldren, Robert C. Coldren, C. William Dahlin and Mark D. Alpert for Plaintiff and Appellant.

Atchison, Barisone, Condotti & Kovacevich, John G. Barisone, Jr.; Endeman, Lincoln, Turek & Heater, Henry E. Heater and Linda B. Reich for Defendants and Respondents.

## OPINION

**PREMO, J.**—In March 2000, plaintiff Los Altos El Granada Investors (Parkowner) applied for a $300-per-month space rent increase for Castle Mobile Estates (Castle), its 108-space "all-age" rent controlled mobilehome park in Capitola. In April 2001, defendant City of Capitola granted an increase of $5.68 per space per month, raising rents to about $210 per month. In July 2002, Parkowner sued Capitola and codefendant City of Capitola Mobilehome Rent Review Board (Board, collectively, City) for inverse condemnation and the "taking" of its property in violation of the California Constitution and it petitioned for a writ of administrative mandamus. Parkowner now appeals the sustaining of City's demurrer without leave to amend and denial of the writ petition. Parkowner raises claims under the California Constitution and challenges the trial court's findings and the sufficiency of the evidence.

## FACTS

We state the facts in some detail because of the sufficiency of the evidence challenge. On July 15, 1987, Parkowner purchased Castle for $1.7 million. Castle was built in the 1970's within walking distance of the Santa Cruz beach. It had a laundry building, asphalt streets and streetlights. By 2000, the area, a desirable location, was booming. It was close to the beach; it had a "robust economy" and proximity to a good job market. Housing prices were rising. Parkowner alleged that the average or median cost of housing in Capitola was more than $500,000 and that "the median price of a single family home statewide, including condominiums, stood at $226,140 as of June 1999." (Underscoring omitted.) More than $30 million in public redevelopment money had been invested in the area. Amenities included a park with sports and play structures, a branch library, underground utilities, and streetscapes improved with sidewalks, bike lanes, streetlights, and landscaping. Private funds revitalized a marginal shopping center.

Mobilehome rents in Capitola were regulated by its mobilehome park rent stabilization ordinance which was enacted in 1979 and amended several times thereafter. Currently, the mobilehome rent control ordinance is found in Capitola Municipal Code, chapter 17.90, rental adjustment procedures for mobilehome parks. However, when the application was heard by City, the ordinance then in effect was chapter 2.18, and we will use the latter section's numbers and language in this opinion.[1]

Section 2.18.220 permitted park owners to increase space rents annually by the lesser of 60 percent of the change in the applicable Consumer Price Index (CPI), or 5 percent of the existing base rent. Park owners could obtain additional increases to recoup expenses for capital improvements. (§ 2.18.00.) The ordinance presumed that allowed rent increases would provide park owners a fair return (§ 2.18.410) but a park owner could rebut this presumption by showing it was not receiving a fair return. In determining fair return applications, the City Council sat as the Board. (§ 2.18.410.) If a park owner was successful, additional increases would be allowed. Other increases were prohibited except as permitted under the ordinance. (§ 2.18.130.)

Castle was covered by the provisions of chapter 2.18 when Parkowner bought it. Rents were around $156 per month. Immediately after the purchase, Parkowner asked for and received a space rent increase to about $180. (§ 2.18.410.) The record of the 1987 application included in the administrative transcript does not show that Parkowner complained then that the base rent set in 1987 deprived it of a fair rate of return on its investment. On the

---

[1] Section and chapter references are to the Capitola Municipal Code unless otherwise stated.

contrary: Parkowner notified homeowners of the $13.23 increase in rent due to pass-throughs for increased taxes, sewer charges, etc., and supplied the Board with additional information as requested. In subsequent years, additional increases were granted, and by 2000, 13 years later, rents had gone up about $50 to approximately $203 per month per space.[2]

In March 2000, Parkowner applied to City for the $300 rent increase even though it believed if it was successful, rents would still be "less than half of market." Because the rent control ordinance did not specify what analytical approach should be used in requesting a rent increase, Parkowner used two alternative analyses, a "premium" approach and a "fair return on equity" approach.

Under the "premium" approach, Parkowner justified the size of the increase by claiming that market space rents were about $1,200 a month and that the resale prices of mobilehomes on rent controlled spaces had soared because "full vacancy control"[3] created a "premium" by precluding increases in space rent upon resale of mobilehomes.

Parkowner opined that rent increases to "remove at least a sizable portion of the 'premium' representing the difference between the Kelly [*sic*] Blue Book value of mobilehomes in the Park and sale prices would range from $785.65 to $338.68." For example, Parkowner calculated a "premium" of $33,280 from the February 1998 sale of a 1970 Galaxy 20 x 44 with a Kelley Blue Book value of $6,720. The "premium" was the difference between the Kelley Blue Book value and the fair market value. The "premium" from the November 1998 sale of a 1971 Galaxy 20 x 44 with the same Blue Book value was $46,280, the difference between the selling price of $53,000 and the Blue Book value. Using the calculation that a $100 increase in space rent corresponds to approximately $10,000 in the value of a mobilehome, Parkowner concluded a $300 per month rent increase would be an "appropriate administrative remedy."[4]

In the alternative, Parkowner presented a "fair and reasonable return" on equity (fair return) calculation based on the acquisition value of the property

[2] Castle had 49 double-wide and 59 single-wide spaces. Individual rents ranged from $186.58 to $206.54.

[3] The term originated in the context of apartment rent control and is somewhat of a misnomer with respect to mobilehome rent control because a mobilehome space is not "vacated" when the mobilehome is sold or transferred. (See *Yee v. Escondido* (1992) 503 U.S. 519, 523 [118 L.Ed.2d 153, 112 S.Ct. 1522].)

[4] Parkowner assured the Board that "no one . . . will be forced from the mobilehome park by virtue of an inability to pay the rent." Parkowner established a "rent deferral program" which allowed homeowners to refrain from paying all or a portion of the increase until the mobilehome was sold, the homeowner moved, "or something else happens in their condition that indicates that they're no longer in the mobilehome park."

as adjusted for inflation. Parkowner's experts, accountants Corbin & Wertz (Corbin), initially computed the minimum rent adjustment necessary for a fair return at $151 per month (an updated report in September 2000 recalculated it to be $148 per month). Parkowner asserted that the calculation did "not account for the true value and equity of the Applicant. . . . [but was] limited to the economic criteria based upon artificially depressed rent levels. The true value of the property, without rent control, would be between [$7.5 and $11 million], depending upon market level rents."

Corbin defined "fair return" as "the measure of financial reward attributed to purchasing, holding, or reselling an investment [which] compensates the investor for capital investment and assuming risk. The unit of measurement in this case is the percentage of funds invested by the mobilehome park owner that is returned on an annual basis." Using a "return-on-indexed-investment" (RII) approach, Parkowner's indexed investment in 2000 was $2,555,125 (the original investment of $1.7 million stated in current dollars). Corbin stated that "buyers evaluate real estate investments using a capitalization rate on the income stream available from the property. The fair capitalization rate for this property was calculated as 11.21%." Multiplying the indexed investment, $2,555,125, by 11.21 percent produced the "fair return on the indexed value," $286,430. Fair rent (expressed as annual revenue) is the sum of the fair return ($286,430) and current operating expenses ($152,103),[5] that is, $455,274. "This annual amount, divided by 107 rentable spaces[6] over 12 months yields the minimum average rent of $354.57, a $151.30 increase, or a 74% increase over the current average rent of $203.27." (In the September 2000 update, Corbin used a fair capitalization rate of 10.73 percent producing a fair return on indexed value of $282,806. Adding that to the park's estimated 2000 operating expenses of $175,170 totals $457,976. Corbin adjusted the management fee and reached a reduced total rent of $450,577.) Divided by 107 spaces and 12 months, Corbin calculated the monthly average fair rent to be $350.92. Subtracting the then-current average monthly space rent of $203.27, Corbin reached a $147.65 rent increase for a minimum reasonable return for this project.

The homeowners (Homeowners) objected. They challenged some expenses in Parkowner's ledger in detail and they contended the park's potential appreciated sales price should be considered in determining an appropriate rate of return because "at some point in the future, [Parkowner is] very likely to make a very healthy profit on the sale of Castle Mobile Home Park [*sic*]."

---

[5] See testimony of Hutchinson and Bloodgood LLP representative Hutchinson, *post*.

[6] Parkowner designated one space a "management" space and excluded the amount of its space rent as rental income. The Board rejected this approach. Noting that 108 spaces were used in the 1987 rent calculation, it used the 108-space figure in determining space rents in this application.

They claimed that "the owners of Castle Mobile Home Park [*sic*] follow a business practice of purchasing mobile home parks with the goal of later selling them at a profit to the homeowners." They had had such an offer from Doug Davis, the owner of Parkowner's off-site management company and a junior partner in the ownership of the park, who had called a meeting with Homeowners on September 13, 2000. He renewed a 1994 offer to sell Castle to Homeowners, this time at from $50,000 to $95,000 per space, up from $45,000 per space. The park had appraised at $1.97 million on November 19, 1998. Homeowners stated that if Parkowner's 1994 offer had been accepted, Parkowner would have received $4.8 million for the park four years before the $1.97 million appraisal. If Davis's 2000 offer had been accepted, Parkowners would have gotten between $5.4 and $9.7 million for the park two years after the $1.97 million appraisal.

Homeowners submitted copies of an escrow statement which showed that Parkowners had just sold Tropics Mobile Home Park in Union City for $38 million—twice its purchase price. Homeowners believed Parkowner was pursuing the hardship rent increase application to "terrorize[] [Homeowners] into purchasing the Park . . . for an inflated amount." Homeowners offered to settle the hardship application with an offer of a $20-per-month-per-space rent increase which was rejected.[7]

Homeowners also asserted that there was no "premium." They compared sales prices of mobilehomes in the park and mobilehomes in adjacent jurisdictions without rent control. Castle's average sales prices did not exceed those sold in other jurisdictions. The average sales price at Castle was $58,995 while those in three non-rent-controlled parks in Campbell were between $69,207 and $78,835, and, in Monterey, in two non-rent-controlled parks, were from $50,036 to $68,666.

Sharon Lake, a tenant and licensed realtor, testified at the hearing before the Board that there was little vacancy risk factor for Parkowner. "[A]s long as the mobile home that occupies the space is owned, the space rent is paid . . . . If the mobile home is removed . . . that's a bonanza because then they can bring in a . . . replacement, and it can be filled." Lake stated that the State of California computes the sales tax on both new and used mobilehomes using the Kelley Blue Book value. However, she stated, "it's not a realistic value for what that mobile home represents." Blue Book values do not include any of the "attachments such as decks, awnings, landscaping,

---

[7] Board members asked Davis why he and the principal representative of Parkowner, Abraham Keh, had purchased Castle if they "truly believed that it was not bringing in enough money under rent control . . . ." Davis replied, "we purchased this Park with the intention of breaking rent control." He added that Parkowner did not expect to get the large rent increase it had requested, but that it would "keep it up" until Homeowners bought the park.

sheds, any other items that [are] personal property that belongs to that owner . . . [they] are not appreciated in that blue book value."

Finally, individual homeowners testified they felt "pressured" by Parkowner's management practices. One resident stated that, in the last eight years, "we have not existed except for three months without some threat to close the mobile home park." First Parkowner "required people to sign long-term leases or they would not allow them into the park. That of course took people off of rent control."[8] When Parkowner was stopped from doing that, it started "to close the park one space at a time, which of course made it very difficult for people to sell their coaches." A four-year court battle stopped that. Then the management "came up with an impact report to close ten more spaces. They also applied for quiet title to certain people on Roland Drive . . . which would . . . give them a second interest in the park because they could close half the park. We had about a three-month break between when the Supreme Court refused to hear their appeal and when they came up with a new scheme to close the park, which is the one that's been in effect since 1997."

Other tenants noted the hardship that a $300 monthly space rent increase would cause. One stated he had been evicted after failing to pay rent for 11 days. He had been sick and had just started a new job. Parkowner would not permit him to sell his mobilehome in place. A buyer would have to remove it. The homeowner expected to be homeless and lose an investment worth $40,000.

City retained the accounting firm of Hutchinson and Bloodgood LLP (Hutchinson) to prepare a report analyzing Parkowner's application and Dr. Kenneth Baar (Baar)[9] to review the ordinance's "fair return standard"

---

[8] Section 2.18.600 allowed park owners to negotiate long-term leases with residents in lieu of being subject to the rent increase limitation of the ordinance.

[9] Baar's surname is repeatedly spelled "Barr" in the record. We will use "Baar" whatever spelling appears. Baar was a consultant for numerous rent control jurisdictions on fair rent issues. He had written articles on fair return issues that have been quoted extensively in published opinions, including *Westchester West No. 2 v. Mont. Co.* (1975) 276 Md. 448 [348 A.2d 856]; *Helmsley v. Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65]; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261]; *Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239]; *Mayes v. Jackson TP. Rent Leveling Bd.* (1986) 103 N.J. 362 [511 A.2d 589]; *Yee v. Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097 [23 Cal.Rptr.2d 1]; *San Marcos Mobilehome Park Owners' Assn. v. City of San Marcos* (1987) 192 Cal.App.3d 1492 [238 Cal.Rptr. 290] (*San Marcos*); *Guimont v. Clarke* (1993) 121 Wn.2d 586 [854 P.2d 1]; *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*); *Rainbow Disposal Co. v. Escondido Mobilehome Rent Review Bd.* (1998) 64 Cal.App.4th 1159 [75 Cal.Rptr.2d 746]; and *Quinn v. Rent Control Board of Peabody* (1998) 45 Mass.App.Ct. 357 [698 N.E.2d 911]. His analysis for City was based on court interpretations of "fair return" and "fair rate of return."

based on "return on 'indexed' investment" and "return 'property interest' lost" due to the rent ordinance.

Hutchinson determined that Parkowner's adjusted net operating income for 1999 ranged from $182,780 to $152,103, depending on how certain attorney fees and expenses were treated.

On September 21, 2000, the hearing before the Board began. Parkowner called Corbin accountant Guy Knuf, who opined that, based on his "return on investment at risk" approach, a monthly space increase of less than $148 would be "confiscatory."

Knuf stated he rejected the "Maintenance of Net Operating Income" (MNOI) approach advocated by Baar for three reasons. First, a base year must be established by "look[ing] at a non-rent [controlled] time frame relatively close to that base year," when market forces, and supply and demand are at work to get market rents at that time. Knuf stated he "felt that we could not establish . . . an accurate base year" for Castle due to the fact that Parkowner acquired the property after it had been under rent control for some years. In addition, Knuf did not feel he could rely on the "numbers and books and records" from 1987, 13 years earlier, because he did not have the "detail to dive into the numbers as I should to come up with a proper calculation."[10]

Finally, Knuf stated the MNOI approach requires the identification of a "point in time . . . where you can assume that the property owner was . . . reasonably pleased . . . with the return he was then receiving." By 1987, rent control had been around "since the late '70's." Knuf could not determine a base year net operating income without knowing whether base year rent levels were artificially high or low.

Parkowner's appraiser, John Neet, testified to the empirical data that supported his conclusion that several mobilehomes in the park had sold for values in excess of their Blue Book values. He stated that buyers of old mobilehomes often removed and replaced them with newer homes. "[W]hen people pay 80 to $100,000 for a 25 to 30-year-old double-wide, when they can purchase a new double-wide off of a lot for 50 or $60,000, there's something obviously going on besides the improving value [sic] of that mobile home. And what is going on is . . . the rents in Castle . . . as well as throughout the City[,] are held down far below what market rents would be."

---

[10] Knuf explained that if there were costs for paving a road, for example, and the costs were expensed, the costs might be something that should have been capitalized. From the numbers provided, he could not tell if the item had been properly characterized.

Neet stated that a Fremont study showed that for every $100 decrease in rent below market level there was a corresponding increase in the value of a mobilehome. He stated that a $300 rise in rent was "far below the reasonable amount"; nevertheless, a minimum rent increase of $300 was necessary to provide a fair return and anything less than the $148 increase recommended by Corbin would not provide a reasonable return on investment.

Neet testified that the 13.3 percent rate of return that Knuf used in his calculations was a supportable rate of return, and that investors in mobile-home parks typically expect a 12 to 16 percent range. "Any less than that, it really doesn't take into consideration the risk and give the reward to the investor for . . . the responsibilities he is taking on as a result of making this investment."

Neet found "outdated" Baar's statement that the components of return on real estate investments include tax flow, appreciation, and tax shelter benefits. The source of that statement was *Mayes v. Jackson TP. Rent Leveling Bd.*, *supra*, 511 A.2d 589. Neet stated that case could not have taken into consideration the changes that happened to real estate investment practices as a result of the Income Tax Reform Act of 1986. Marginal tax rates were dropped, appreciation schedules were lengthened, and limitations were placed upon deductions of losses from real estate against income from other sources. Prior to that, a lot of people bought real estate and lost money on it, "but they were happy doing it because they could write those losses off against their income. After 1986, that ceased to exist."

Neet stated that similarly, the "appreciation" factor Baar utilized in his analysis was "stunted and minimized" in a rent controlled environment such that it no longer existed. For example, he declared that Parkowner's increase in net operating income since 1988 was 1.5 percent a year, less than inflation. "When we talk about a return, it's a return on an investment, not a return on getting cheaper dollars." Looking at the rate of return for an investment with similar risks, 1997 and 1998 surveys show that non-rent-controlled mobile-home parks across the country had a 3.2 to 6.2 percent rate of growth, including regions with depressed economies as well as urban areas with rising housing costs. An investor in a rent controlled mobilehome park would expect a higher rate of return—12 to 16 or 17 percent—than the investor in a non-rent-controlled park "because their upside is limited." Neet stated he had no information on rates of return for rent controlled parks.

Baar, in his report and testimony, discussed "fair return" using an MNOI standard including indexing for inflation, although he also calculated rent increases using the alternative RII approach presented by Corbin. Baar stated he used "the index investment" because it was "what the applicants used. . . .

[I]t's not the actual cash investment or the actual total price they paid for the property that's being used as the base rate. It's this investment they made in the property, adjusted by the CPI."

Baar determined that the proper MNOI base period was calendar year 1987, the last year in which the city had conducted a thorough review of the Park's income and expenses. At the hearing, he defended his use of 1987 as a base year on the ground that an earlier Board decision based on that year had been accepted by Parkowner and had provided a fair return. He calculated Castle's 1987 adjusted net operating income to be $145,108. Indexing this by percentages ranging from 40 to 100 percent of the CPI increase from April 1987 through December 1999 resulted in monthly space rent increases of $3.18 at 40 percent CPI net operating income (NOI) indexing, $20.81 at 70 percent, and $38.44 at 100 percent. With an adjusted investment, Parkowner's 2000 rate of return was 6.7 percent. Using 70 percent indexing, the increased rate of return would be approximately 8 percent. Capitalization rates for mobilehome park sales averaged about 8.8 percent and did not include appreciation. This was the rate of the NOI to the value of the property. Baar used capitalization rates from 27 sales in the San Francisco area from 1993 to 1999, unlike Parkowner's rate of return which was calculated on projected 2000 operating expenses.

Baar stated that one reason for indexing NOI at less than 100 percent of the change in the CPI was that real estate is often a leveraged investment. In a leveraged investment, a substantial part of the investment is financed. The investor invests a small amount of cash, but gets appreciation on 100 percent of the value.

Baar stated the NOI from a property is only part of the return on investment. Another part is appreciation. When other witnesses said investors expect 11 to 17 percent rates of return, those rates include appreciation. Comparing those rates to a mobilehome park's 8 percent rate derived from NOI is like comparing apples and oranges. The part of the rate of return that the Board was being asked to adjust was what the rent would be based on an adjustment of the NOI. "You're not adjusting the value and deciding how much appreciation the park owner should get and calculating that in the return . . . , [although] that might affect what rate you consider is reasonable."

Baar also opined that the "premium" theory based on an increase in value of mobilehomes in the park was not a "fair return" theory and was therefore inapplicable. "Fair return is determined by whether a regulated property owner is permitted a fair return (fair profit), rather than by computing the benefit of the regulation to the protected consumer. [¶] The 'property interest' theory which bases the allowed rent increase on the increase in the value of

the mobilehomes [*sic*] is not a [']fair return['] criteria [*sic*] and, therefore, is not applicable in this case."

Finally, Baar reviewed Parkowner's application's RII approach. He stated that using the 1987 purchase price as the investment base was inconsistent with the ordinance. Furthermore, under the RII approach, the result differed depending upon what rate of return was used. Parkowner's 11.2 percent rate would justify a monthly increase of $41.78, but a more normal 8.8 percent capitalization rate based on data from mobilehome sales in the area would justify only a $25.86 monthly rate increase.

The Board found that in 1987 Parkowner accepted the Board's determination that Castle's NOI was $145,108, that it could have contended that it was not receiving a fair rate of return under section 2.18.510, "but it did not." The Board found MNOI to be the best approach under chapter 2.18 because it was consistent with the purposes of the existing rent control ordinance and courts have upheld the approach in the past. The MNOI approach was a reasonable means for providing a fair return and noted that section 2.18.410 stated, "It will be presumed that the application of this chapter and previous rent review ordinances has resulted in a fair rate of return." (§ 2.18.410.) The Board found the MNOI approach "observes this direction by using as a base fair return a prior NOI, which in 1987 was determined by the City to be fair, and was accepted by the applicant."

In determining the rent increase, the Board recognized the necessity of adjusting the December 1987 NOI ($145,108) for inflationary effects. It selected the San Francisco-Oakland-San Jose area "all items less shelter" index with the relevant period running from December 1987 through December 1999. During that period, the CPI increased by 40.9 percent. Increasing the December 1987 NOI by 40.9 percent resulted in a December 1999 NOI of $204,457. The Board found that the NOI based on current rents was $190,684. "Therefore in order to increase NOI to $204,457, total rents must be increased by $13,773.17." The Board divided this amount by 108 spaces and 12 months, subtracted the rent increase for calendar year 2000 which had already been allowed (60 percent of CPI), and determined the rent increase would be $5.68.

The Board rejected Parkowner's return on investment approach based on the purchase price as "contrary to section 2.18.405 because it [wa]s premised on the assumption that return must be calculated on the basis of the price which the applicant paid for the park." (Underscoring in original.) Further, Parkowner did not cite legal authority that mandated the starting point of rent control analysis must be the applicant's 1987 purchase price as required by section 2.18.410. The Board found that theory defective for reasons stated by

Baar[11] and by the Board's staff.[12] "The central defect of that approach is that it results in the rent rates being controlled by park buyer and seller, not the Rent Board, such that rents would be quite capable of rising to the levels that would exist without rent control. Moreover, the applicant's approach is entirely theoretical. No empirical data is supplied to verify the assumptions the applicant uses in formulating its version of a return on investment formula."

The Board found that the increases it granted not only provided a fair return per the MNOI approach, but they also resulted in a fair return on investment, even if investment was equated with Parkowner's 1987 purchase price. The NOI at the beginning of 2000 was 11.2 percent of the 1987 purchase price. The level of returns that were attracting new purchases of mobilehome parks indicated that "the prevailing capitalization rate NOI/purchase price ratio was 8.8%. In one-quarter of the cases the capitalization rate was less than 8.25%. [The median was 8.7 percent.] . . . Most of the parks in the sample were subject to mobilehome [*sic*] rent control. The most comparable type of investments to mobilehome [*sic*] park investments (besides other mobilehome [*sic*] park investments) would be apartment investments. In recent years, capitalization rates for apartments have been about 9%." (Fn. omitted.) The Board found that the granted increase "provides the applicant with growth in income and appreciation. It would double the equity of a typically leveraged investor within the twelve year holding period, a period when the increase in the CPI was 40.9%."

The Board specifically rejected Parkowner's "risk premium" theory and cited the October 16, 2000 staff report which set out specific defects in the analysis. The report quoted Parkowner's statement, "Real estate projects . . . carry business risk, which is based on the overall impact of the property. For example, a property which is pre-leased to credit-worthy tenant [*sic*] carries a

---

[11] Baar stated that application of a return on investment standard could provide "windfall" returns to recent investors (*Fisher v. City of Berkeley, supra*, 37 Cal.3d at pp. 691–692) and that the "regulated" entity can regulate the allowable return by determining the size of the investment. (*Park Ave. Tower Associates v. City of New York* (2nd Cir. 1984) 746 F.2d 135, 138–140.)

[12] The staff report quoted Baar, who had written "theories [such as the 'premium' theory] are not the subject of a fair return hearing. Fair return is determined by whether a regulated property owner is permitted a fair return (fair profit), rather than by computing the benefit of the regulation to the protected consumer. [¶] The 'property interest' theory which bases the allowed rent increase on the increase in the value of the mobilehomes [*sic*] is not a fair return criteria [*sic*] and, therefore, is not applicable in this case." The staff added that in 1987, the mobilehome rent control law, Ordinance No. 626, contained only one approach for determining a fair rate of return—MNOI. At the time Parkowner made the investment, based on Ordinance No. 626, and at the time of the application, when section 2.18.400 provided, "fair rate of return" "shall be determined with reference to reasonable investment rather than property value," Parkowner should have expected MNOI determination of rent increase applications.

lower business risk than one which is 'built on spec' and relies on a large number of less credit-worthy tenants who are yet to be signed up. [¶] Management is also an element of business risk because the operational skills of the management to collect rents, maintain the property, relate to tenants and so forth, can dramatically impact returns. Market risk is associated with supply and demand factors such as overbuilding, urban blight, and local regulations such as rent control. Financial risk is impacted by factors such as the ability to maintain net operating income and cover debt service. For instance, a large variable rate loan can severely impact returns during periods of high interest rates."

The report found that in light of the realities of Castle, "there is nothing analogous to a property that has been built on spec and has yet to locate tenants. The 'management element' and the 'supply and demand factors,' . . . are exceedingly minor risks for a mobilehome [*sic*] park located in the City of Capitola." The report quoted the findings in section 2.18.110: there was a shortage of mobilehome spaces in Capitola and the surrounding area, resulting in a low vacancy rate and, but for rent control, rapidly rising space rents. Mobilehome owners invested substantial sums in their mobilehomes and appurtenances, and alternative sites for the relocation of these homes were difficult to find and moving and reinstallation costs were expensive, with possibilities of damage to the units.

The report pointed out that Parkowner acknowledged a significant gap between controlled rent rates and market rates, and found "[t]he obvious result is a considerable demand for rent-controlled spaces. This virtually guarantees that rents will not drop below their rent-controlled levels as a result of any lack of demand or mediocre management." An "ordinance based on an MNOI formula . . . insulates a park from the risk that it will not be able to maintain net operating income."

No evidence in the record showed that Parkowner had "a large variable rate loan. . . . Finally, . . . the applicant's risk premium concept entirely ignores the probabilities of appreciation." "[T]he possibilities of appreciation more than offset the risks articulated in the application as justifying the 'risk premium.' "

The report pointed out that in building its case for risk, Parkowner claimed that Castle was worth only $1.9 million. However, Parkowner's asking price, in its negotiations with Homeowners to buy their spaces, was between $55,000 and $95,000 per space. This would translate into an approximate valuation of $6 to $10 million.

The Board found Parkowner's "return on fair value" approach also defective because the applicant treated debt service interest as a cost, but inconsistently computed return with reference to the full purchase price rather than the unleveraged portion of the purchase price.

At its meeting on April 21, 2001, City adopted the "Rent Board Final Findings," and granted a rent increase of $5.68 per space per month with a surcharge for 12 months up to $9.69 for costs for City's expert witnesses attributed to Parkowner. Rents increased to approximately $210 per month.

## THE LAWSUITS

On June 14, 2001, Parkowners and others filed a federal action, *Hillsboro Properties v. City of Capitola* (N.D.Cal. Jan. 22, 2002, No. C-01-20543-JF) (*Hillsboro*). On June 17, 2001, Parkowner filed a separate action based upon the same facts, *Los Altos El Granada Investors v. City of Capitola* (N.D.Cal. Jan. 22, 2002, No. C-01-20667-JF) (*Los Altos I*) raising the same claims as in the instant case. Parkowner asserted in both that the rent control ordinance violated the United States Constitution "as applied" to Parkowner. The causes of action contained in the federal case were all predicated on the violation of rights protected under the federal Constitution and title 42 United States Code section 1983 except for Parkowner's petition for a writ of mandamus, included as a supplemental claim pursuant to title 28 United States Code section 1367. No claim was based on a violation of the California Constitution. On January 22, 2002, the district court dismissed both of Parkowner's complaints but allowed Parkowner to file an amended complaint that addressed the pleading deficiencies in *Los Altos I*.[13] The dismissal was affirmed in an unpublished decision of the Ninth Circuit, *Los Altos El Granada Investors v. City of Capitola* (9th Cir. 2004) 97 Fed.Appen. 698.

---

[13] *Los Altos I* was consolidated with Parkowner's earlier federal action in *Hillsboro*. Parkowner and City were parties in both of them. In *Hillsboro*, after City declined to amend the rent control ordinance to include a mechanism which prevented mobilehome owners from capturing any "premium," Parkowners sued in federal court. The court found the taking claim to be unripe, and the "premium" and taking claims to be facial challenges to the statute which were barred by the statute of limitations. The court stated that Parkowner's attempt to amend the statute did not "restart the clock on [the] statute of limitations . . . ." Furthermore, the allegation that City failed to provide Parkowner with a fair return was not ripe because the allegation that Parkowner exhausted its administrative remedies was insufficient and "nothing in the present record suggests that [Parkowner] could not prevail and obtain adequate relief in an inverse condemnation action in California court." The court declined to exercise jurisdiction over the petition for a writ of mandate because "all claims over which it has original jurisdiction in the case had been dismissed."

In *Los Altos I*, Parkowner raised the same issues regarding Castle that it is litigating in the instant case.

On July 3, 2002, Parkowner filed the instant action in the Santa Cruz County Superior Court, and on August 20, 2003, Parkowner filed *Los Altos El Granada Investors v. City of Capitola* (N.D.Cal., No. C-03-3859-JF) (*Los Altos II*). *Los Altos II* was dismissed because the district court declined to exercise supplemental jurisdiction over Parkowner's "takings," due process claims, and petition for a writ of administrative mandamus under state law, which were "essentially . . . an application parallel to that pending in the superior court." The writ petition in the instant action was dismissed in June 2004.

Parkowner filed an appeal in the instant case on August 26, 2004, and a fourth federal action on December 3, 2004, *Los Altos El Granada Investors v. City of Capitola* (2004) (N.D.Cal. July 26, 2005, No. C-04-5138-JF) (PVT) (*Los Altos III*). City filed a motion to dismiss. This court has taken judicial notice of the opinion filed in that case on July 26, 2005. The district court dismissed the fifth cause of action alleging the ordinance failed to substantially advance a legitimate state interest under *Lingle v. Chevron USA, Inc.* (2005) 544 U.S. 528 [161 L.Ed.2d 876, 125 S.Ct. 2074] (*Lingle*).

As for Parkowner's "takings" claims, the district court characterized them as timely as-applied challenges because "[P]arkowner's claim was not based solely upon enactment of the ordinance but also upon complex economic factors and the rent control board's refusal to grant requested rent increases." The court found that the claims were ripe under the *Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172 [87 L.Ed.2d 126, 105 S.Ct. 3108] test and that the state "had been given fair warning that the plaintiff was asserting a takings claim and a fair opportunity to provide just compensation" under *Hacienda Valley Mobile v. Morgan Hill* (9th Cir. 2003) 353 F.3d 651, 658.

The district court stated that the doctrine of res judicata did not apply to Parkowner's public "takings" and due process claims because the district court dismissal was for lack of jurisdiction and not on the merits and that although the private takings claim dismissal "technically raises a *res judicata* bar to Plaintiff's assertion of a private takings claim in the instant action," the court in *Los Altos I* did not intend to effect a final adjudication of that claim on the merits. The court "clarifie[d] that its prior dismissal of the private takings claim was without prejudice." The court stated that since the state court appeal was still pending, it was appropriate to abstain from considering the claims pending disposition of the state court appeal under *Younger v. Harris* (1971) 401 U.S. 37 [27 L.Ed.2d 669, 91 S.Ct. 746] (*Younger*). The court stayed the case pending disposition of the state appeal.

## STATE ACTION CLAIMS

In superior court, the first cause of action for declaratory relief (1) sought a judicial declaration that City's application of the rent control ordinance was unconstitutional under the California Constitution because it effected an uncompensated taking of property; (2) alleged that the ordinance failed substantially to advance a legitimate state interest as required by *Richardson v. City and County of Honolulu* (9th Cir. 1997) 124 F.3d 1150, certiorari denied (1998) 525 U.S. 871 [142 L.Ed.2d 137, 119 S.Ct. 168] (*Richardson*); (3) claimed that City denied Parkowner due process and equal protection under the California Constitution; and (4) asserted that the ordinance as applied by City did not provide Parkowner with a just and reasonable return as required by the California Constitution. Parkowner also claimed it was deprived of due process of law as one of only five private park owners in Capitola subject to vacancy control. It was deprived of equal protection of the law as it was being treated differently from all other property owners in Capitola in that it was required to bear the burden of providing affordable housing.

The cause of action for inverse condemnation asserted that denial of the requested rent increase caused a "taking" and an intentional diminution in the value of the park. The third cause of action for administrative *mandamus* asked the court to compel City to give Parkowner "a fair hearing and a rent increase sufficient to allow for a just and reasonable return and to provide Plaintiff with due process."

The complaint included an "*England* reservation" (*England v. Medical Examiners* (1964) 375 U.S. 411 [11 L.Ed.2d 440, 84 S.Ct. 461] (*England*)), that is, it notified the state court that Parkowner intended to pursue only its state law claims in state court and to reserve the federal claims for subsequent litigation in federal court.

City filed a demurrer and a motion to strike the *England* reservation. The trial court sustained the demurrer without leave to amend as to both the first and second causes of action stating that a declaratory relief action was improper to attack a rent decision by an administrative agency. Also, the first two causes of action were facial challenges to the ordinance which were barred by the statute of limitations and the res judicata/collateral estoppel effect of the two prior federal decisions, and, to the extent these causes of action were "as applied" challenges to the rent decision, they were unripe because Parkowner had not exhausted its state court remedies by first obtaining a decision on its petition for a writ of administrative *mandamus* cause of action. The court granted City's motion to strike Parkowner's *England* reservation, and set a hearing on the petition for a writ of *mandamus* on the administrative record only.

At the hearing on the writ petition, the trial court stated that a landowner's application to raise the rent does not involve a fundamental right for purposes of review and applied a substantial evidence standard of review.

The trial court found that any "premium" was not due solely to rent control, but involved other factors such as the cost of moving a mobilehome, scarcity of spots within mobilehome parks, desirability of location in a park, and anticipated rents. An important factor that would give rise to a "premium" is the rising cost of other housing making people willing to pay more for mobilehomes. "So the assertion that the premium is due solely to the rent control law is suspect."

Using evidence that the average prices paid for mobilehomes in the five non-rent-controlled parks closest to Capitola were between $50,000 to $79,000 from January of 1998 to the present, and that the average sale price at Castle was about $59,000 during the same period, the trial court stated the implication was that the difference between the book value and the sales price was not solely due to rent control. The court concluded that substantial evidence supported City's decision.

Parkowner had requested a statement of decision which the trial court ordered City to prepare. Parkowner later objected to City's proposed statement of decision; the trial court denied a hearing and signed it without revision.

Parkowner's petition for a writ of administrative mandamus was heard on May 25, 2004. The trial court found that Parkowner's premium-based regulatory takings claims were meritless and that the ordinance as applied was reasonably related to and substantially advanced its stated purposes. The court denied the petition and awarded City costs.

## ISSUES ON APPEAL

Parkowner claims the trial court erred in (1) sustaining a demurrer to its constitutional claims; (2) striking its *England* reservation; and (3) denying issuance of a writ of administrative mandamus. On the latter point, Parkowner alleges the trial court (1) improperly made new findings never made by the Board; (2) made a decision not supported by the evidence; (3) mistakenly failed to apply its independent judgment; (4) made no findings upholding the Board's RII analysis; (5) failed to consider whether a rent increase was necessary to prevent a regulatory taking; and (6) issued an unclear and inconsistent statement of decision which fails to address critical findings.

## STANDARD OF REVIEW

Denial of Parkowner's petition for a writ of administrative mandamus is reviewed by using the substantial evidence test. (Code Civ. Proc., § 1094.5, subd. (c); *San Marcos, supra,* 192 Cal.App.3d at pp. 1499–1504.) "The substantial evidence test requires the court to begin with the presumption that the record contains evidence to sustain the board's findings of fact. [Citation.] The board's interpretation of an ordinance's implementation guidelines is given considerable deference and must be upheld absent evidence the interpretation lacks a reasonable foundation. [Citation.] The burden is on the appellant to prove the board's decision is neither reasonable nor lawful." (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 287 [82 Cal.Rptr.2d 569].)

The sustaining of a demurrer without leave to amend is reviewed de novo. The reviewing court exercises its independent judgment as to whether a cause of action has been stated as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479], cert. den. (1991) 499 U.S. 936 [113 L.Ed.2d 444, 111 S.Ct. 1388].) The appellant bears the burden of proving the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

## DEMURRER ON THE COUNT 2 CONSTITUTIONAL CLAIMS

Parkowner claims there is no basis in California law for the trial court to have sustained City's demurrer to its inverse condemnation, due process, and equal protection claims alleged in count 2 on the basis that they were not "ripe" until the writ of mandamus cause of action was decided. Parkowner states, "the 'ripeness' doctrine arises from federal law and, by definition[,] ha[s] no application in state court. In any event, even under federal law, the ripeness doctrine does not require the completion of a judicial challenge to the administrative decision prior to bringing a damage claim."

In its order sustaining the demurrer without leave to amend on count 2, the trial court stated, "the challenges to the alleged 'premium' are facial challenges which are barred by the statute of limitations and the res judicata/collateral estoppel effect of the two prior federal actions; [¶] b. any 'as applied' challenge to the Rent Review Board's rent decision whether taking, equal protection or due process challenges are not ripe because Parkowner has not exhausted its state court remedies by first obtaining a decision on its Petition for Writ of Administrative Mandamus Cause of Action which may render those claims moot."

■ "Under the *'ripeness'* doctrine, a court may deny review where the issues raised by a general challenge to an administrative rule or policy are not 'sufficiently concrete to allow judicial resolution even in the absence of a precise factual context.' The court must 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' [Citation.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Administrative Proceedings, § 107, p. 1153, original italics.)

■ Our case did not involve just a "general challenge to an administrative rule or policy" but also raised as-applied taking, due process, and equal protection claims. Parkowner faults the trial court for using the word "ripe" when it is clear from the whole sentence that the trial court was finding Parkowner had not exhausted its administrative remedies. California courts have sometimes used the word "ripe" in this context. (See, for example, *County of Alameda v. Superior Court* (2005) 133 Cal.App.4th 558, 566–568 [34 Cal.Rptr.3d 895] [*"Ripeness and Finality in Taking Cases"*]; *Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 791, fn. 2 [90 Cal.Rptr.2d 598] *(Montclair)*; *Sandpiper Mobile Village v. City of Carpinteria* (1992) 10 Cal.App.4th 542, 549 [12 Cal.Rptr.2d 623] *(Sandpiper).*) It is clear they were invoking the concept of "finality" which requires that an administrative adjudication result in a final administrative order or decision before it can be reviewed by the courts. (9 Witkin, Cal. Procedure, Administrative Proceedings, *supra,* § 107, at p. 1152.)

■ "The impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction. A final administrative decision includes exhaustion of any available review mechanism [as is the issue here]. Utilization of available avenues of administrative relief is necessary because the court 'cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes.' [Citations.]" *(Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 12 [32 Cal.Rptr.2d 244, 876 P.2d 1043] *(Hensler).*) "The exhaustion requirement is jurisdictional, rather than discretionary with the court." (9 Witkin, Cal. Procedure, Administrative Proceedings, *supra,* § 108, at pp. 1153–1154; but see *Grant v. Comp USA, Inc.* (2003) 109 Cal.App.4th 637, 644–645 [135 Cal.Rptr.2d 177].)

In this case, Parkowner took the first step in exhausting administrative remedies by making a meaningful application for a rent increase, receiving a fractional rise, and thereafter challenging the Board's decision by filing a

petition for writ of administrative mandamus. However, Parkowner had not completed the final step, judicial review through a petition for a writ of administrative mandamus, at the time the demurrer was heard.

■ This case presents an interesting procedural tangle. Parkowner had the right to present its constitutional claims in a state forum along with its petition of a writ of administrative mandamus. Our Supreme Court in *Hensler*, *supra*, 8 Cal.4th at page 14, stated that an " 'as applied' challenge to . . . restrictions imposed by the administrative agency, may be properly made in a petition for writ of 'administrative' mandamus to review the final administrative decision [citation] and that action may be joined with one for inverse condemnation. A declaratory relief action also may be joined with an action in inverse condemnation. [Citation.] Damages for the 'taking' may be sought in an administrative mandamus action [citation], or, if the plaintiff seeks a jury trial, in the joined inverse condemnation action."

However, the viability of Parkowner's first and second causes of action depended upon its obtaining a resolution of the third cause of action, the writ petition, which claimed that City's denial of the rent application was an arbitrary and capricious abuse of discretion which denied Parkowner a fair return, denied it reimbursement of costs of the administrative hearing to which it was entitled, and resulted in the denial of a fair hearing. The allegations in the writ petition as in the other causes of action were based on the general allegations in the complaint raising constitutional issues.

City, on the other hand, had the right to challenge Parkowner's complaint by demurrer. (Code Civ. Proc., § 430.10.) " 'A demurrer tests the legal sufficiency of the complaint.' [Citations.] On appeal from an order of dismissal after an order sustaining a demurrer, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law. [Citation.] We deem to be true all material facts properly pled [citation] and those facts that may be implied or inferred from those expressly alleged." (*Montclair*, *supra*, 76 Cal.App.4th at p. 790.)

We think the trial court followed a reasonable course in hearing the demurrer first, but, as will become clear, it should have granted Parkowner's postwrit request to amend its complaint.

In sustaining the demurrer without leave to amend on challenges it ruled to be facial challenges, the court did not abuse its discretion. (*Montclair*, *supra*, 76 Cal.App.4th at p. 790.) Parkowner alleged that the rent control ordinance, as drafted and as applied, caused a taking over time by causing a "premium," and did not substantially advance a legitimate state interest as contemplated

by *Richardson, supra,* 124 F.3d 1150 and *Chevron USA, Inc. v. Cayetano* (9th Cir. 2000) 224 F.3d 1030. Furthermore, Parkowner sought "an administrative remedy for the lack of vacancy control [*sic,* decontrol?] so as to prevent a regulatory taking."

The trial court correctly found that these claims were facial challenges to the ordinance. (See *Montclair, supra,* 76 Cal.App.4th at p. 786 ["premium" theory challenge is facial challenge]; *Yee v. Mobilehome Park Rental Review Bd.* (1998) 62 Cal.App.4th 1409, 1420–1421 [73 Cal.Rptr.2d 227] [vacancy control challenge not as-applied claim]; *Sandpiper, supra,* 10 Cal.App.4th at p. 549 [as-applied claim that vacancy control did not advance a legitimate governmental interest was a facial challenge].) As facial challenges, these claims were barred by the statute of limitations and Parkowner could not amend them to state a cause of action.[14]

 There is another problem with this case, however, and that is the reliance by the parties and the court on the concept that the ordinance either did or did not "substantially advance a legitimate government interest." The United States Supreme Court has held that the "substantially advances" formula "is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation." (*Lingle, supra,* 544 U.S. at p. 545.) "[T]his formula prescribes an inquiry in the nature of a due process, not a takings, test, and . . . has no proper place in our takings jurisprudence." (*Id.* at p. 540.)

 In the instant case, in denying the writ petition, the trial court found that Parkowner's premium-based regulatory takings claims were meritless and that the ordinance as applied was reasonably related to and substantially advanced its stated purposes. The error of applying a due process test in determining a takings claim requires reversal.[15] Furthermore, since the error permeates the case from pleadings to final determination, and because Parkowner was not allowed to amend its as-applied takings, equal protection, and due process claims when they were ripe, Parkowner should be allowed to amend its complaint.

---

[14] Parkowner also alleged that City's actions in denying its rent application, in failing to uniformly apply the rent control ordinance to all mobilehome parks in the City, and in failing to grant Parkowner reimbursement for costs of the administrative proceeding denied it a fair and reasonable return, equal protection, and due process of law.

[15] This result makes moot Parkowner's additional complaints based on the "substantially advances" formula, the court's denial of administrative mandamus, the independence or not of the trial court's judgment, and criticisms of the statement of decision.

## THE *ENGLAND* CLAIM

Next, Parkowner claims the trial court erred in striking its *England* reservation (*England, supra,* 375 U.S. at pp. 420–421). The order sustaining the demurrer simply stated, "City's Motion to Strike Parkowner's *England* Reservation . . . is granted because an *England* Reservation is irrelevant and not proper in the context of this case."

On appeal, Parkowner claims the order striking the *England* reservation "is a nullity" because "the Trial Court effectively concluded it could decide (for the federal courts) whether or not [Parkowner] could reserve its federal claims for litigation in federal court." Parkowner contends the trial court misapplied federal law because neither City in opposing the *England* reservation or the court in striking it "cite[d] a single case for the proposition that a state court can strike an *England* reservation or . . . that an *England* reservation cannot be asserted after a federal action is dismissed on the grounds of ripeness." (Underscoring original.)

In *England,* plaintiffs, graduates of chiropractic schools, filed suit in federal court challenging the educational requirements of a state statute which limited their right to practice in Louisiana. Because there were unsettled questions of state law which, when resolved, would obviate the need for a decision on the federal constitutional questions presented, the federal court abstained from considering the issues. (*Railroad Comm'n v. Pullman Co.* (1941) 312 U.S. 496 [85 L.Ed. 971, 61 S.Ct. 643].) The state court held that the state law applied to chiropractors and found that it was not unconstitutional. When plaintiffs returned to federal court to resume their constitutional challenge, the district court dismissed the action on the ground that the state court determination was entitled to preclusive effect. (*England, supra,* 375 U.S. at pp. 413–415.) The Supreme Court reversed, holding that a party who has been subject to a *Pullman* abstention may reserve his federal claims for federal adjudication by informing the state court of the nature of his federal claims, that he does not wish to litigate those claims in state court, "and that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." (*Id.* at p. 421.) In reaching its holding the high court stressed that in the *Pullman* abstention context, the plaintiff's presence in state court is compelled and involuntary. In contrast, "if a party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then . . . he has elected to forgo his right to return to the District Court." (*Id.* at p. 419.)

In its brief, Parkowner states it presumes that the trial court adopted City's arguments in striking the reservation. City had argued that an *England*

reservation must be stricken unless the case involves a case brought to state court after assertion of *Pullman* abstention. In this case, when Parkowner filed the instant action, its *Hillsboro* and *Los Altos I* federal actions had been dismissed, although Parkowner had leave to amend *Los Altos I* to address its pleading deficiencies. (See *ante*, THE LAWSUITS, at pp. 644–645.) It was not until a year after the state action was filed that Parkowner filed *Los Altos III*, the case in which the district court refrained from considering Parkowner's claims pending disposition of the state court appeal.

■ The district court abstained under *Younger*, *supra*, 401 U.S. 37, not under *Pullman*, although the district court agreed that *Pullman* abstention would be an appropriate alternative. The *Younger* doctrine espouses "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." (*Middlesex Ethics Comm. v. Garden State Bar Assn.* (1982) 457 U.S. 423, 431 [73 L.Ed.2d 116, 102 S.Ct. 2515].) "*Younger* abstention is required if the state proceedings are (1) ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims. [Citation.]" (*The San Remo Hotel v. City and County of San Francisco* (9th Cir. 1998) 145 F.3d 1095, 1103.) The district court found that the state proceedings were ongoing at the time of its decision because state court proceedings "are deemed on-going for purposes of *Younger* abstention until state appellate review is completed" (*Gilbertson v. Albright* (9th Cir. 2004) 381 F.3d 965, 969, fn. 4 (*Gilbertson*)); the state proceedings implicate the important state interest in enforcing and considering the constitutionality of mobilehome park rent control ordinances (*Mission Oaks Mobile Home Park v. City of Hollister* (9th Cir. 1993) 989 F.2d 359, 360 (*Mission Oaks*), overruled on other grounds, *Green v. City of Tucson* (9th Cir. 2001) 255 F.3d 1086; and state courts provide an adequate forum for raising federal constitutional takings claims. (*Mission Oaks*, *supra*, 989 F.2d at p. 361.) Parkowner did not attempt to raise its federal constitutional takings claims in the instant case. However, when a plaintiff could have presented all of his constitutional claims in the state proceeding, but chose not to do so, this failure to avail himself of the opportunity does not mean that the state procedures are inadequate and does not preclude *Younger* abstention. (*Gilbertson*, *supra*, 381 F.3d at p. 983.)

A prerequisite to a *Younger* abstention is a finding that the federal action would have the same "practical effect" on the state proceeding as a formal injunction. (*Gilbertson*, *supra*, 381 F.3d at pp. 977–978.) The district court concluded that "a determination that the federal plaintiff's constitutional rights were violated would be just as intrusive as a declaratory judgment," and thus that abstention was appropriate. (*Id.* at p. 980.) "In the instant case, a determination that the City effected a taking of Plaintiff's property without just compensation in violation of the Fifth Amendment would have the practical effect of a declaration establishing that Plaintiff was denied a fair

rate of return by the Board and that the application of the Ordinance effected a confiscatory taking under state law. This is precisely the type of interference that was found adequate to warrant *Younger* abstention in *Gilbertson.*" The district court stayed *Los Altos III* pending disposition of the state court appeal.

City cites numerous federal cases for the proposition that the *England* doctrine is limited to cases where there has been a federal court abstention and a federal litigant is compelled to seek state court determination of claims. (*Montana v. United States* (1979) 440 U.S. 147, 163 [59 L.Ed.2d 210, 99 S.Ct. 970]; see, for example, *Fuller Co. v. Ramon I. Gil, Inc.* (1st Cir. 1986) 782 F.2d 306, 312 [notwithstanding state court defendant's repeated statement it was reserving a federal question, federal court held *England* federal claims reservation is available only "by properly invoking the jurisdiction of the federal court in the first instance"]; *Tarpley v. Salerno* (2nd Cir. 1986) 803 F.2d 57, 60 [*England* reservation has no application in a case in which there was never an abstention by a federal court]; *Schuster v. Martin* (5th Cir. 1988) 861 F.2d 1369, 1373–1374 [plaintiff's filing of a state court document purporting to reserve all his federal claims under *England* was ineffective "where the plaintiff voluntarily chooses to pursue the state action first" and " 'in which there never was an abstention by a federal court' "]; *Duty Free Shop v. Administracion De Terrenos* (1st Cir. 1989) 889 F.2d 1181, 1183 (*Duty Free Shop*) [*England* state court federal claims reservation is ineffective if the federal court abstention is on *Younger* rather than *Pullman* grounds]; *Mission Oaks, supra,* 989 F.2d at p. 362 [*England* reservation inappropriate in the context of *Younger* abstention].)

Notwithstanding, City also refers us to *Montclair, supra,* 76 Cal.App.4th at page 789, footnote 1, where the court mentioned that plaintiffs had made an *England* reservation and limited its claims to state constitutional questions. Apparently there was no objection to the *England* reservation in the trial court. The opinion in *Montclair* gave no details about the timing of the filing of the two actions, whether there was an abstention in the federal case, or whether there was consent by the city to the reservation. (See *Dodd v. Hood River County* (9th Cir. 1995) 59 F.3d 852, 862–863.) *Montclair* does not seem to be helpful to us here.

■ We conclude the trial court did not err in striking the *England* reservation. "*England,* and its reservations, are not relevant here, in the *Younger* context, where the purpose of abstention is not clarification of state law, but reluctance to interfere with an ongoing state judicial proceeding." (*Duty Free Shop, supra,* 889 F.2d at p. 1183.)

Parkowner cites *Bradley v. Pittsburgh Bd. of Educ.* (3rd Cir. 1990) 913 F.2d 1064 and *United Parcel Service v. California Pub. Utilities* (9th Cir. 1996)

77 F.3d 1178 for the propositions, respectively, that "the core principal [*sic*] of *England* is its preservation of litigation's access to a federal forum he originally chose," and " '[a] free and unreserved submission to the state court of all federal claims for complete and final resolution is necessary to bar return to the federal court.' " (*Id.* at p. 1184.)

Although Parkowner chose federal district court as its original forum, by the time it filed its state court claims, there was no federal forum with jurisdiction over the matter for Parkowner to go back to. The trial court did not err in striking the *England* reservation.

## BASE YEAR

Next, Parkowner complains the Board utilized a base year which was eight years after rent control had been adopted in 1979. Parkowner states it was necessary to adopt a pre-rent-control year as a base year. "No evidence was presented at the hearing to support the use of a post-rent control base year . . . . There was no evidence that the 1987 rents were at fair market levels in 1987." Parkowner also complains that there was a finding that Parkowner had agreed in a prior rent increase application that Parkowner had accepted its 1987 NOI as fair. Parkowner complains there is no evidence in the administrative record supporting this finding.

We conclude the Board had discretion to use 1987 as a base year and its decision was a reasonable one based on expert testimony. The purpose of selecting a base year is to find a starting point at which the base rent levels reflect general market conditions (*Vega v. City of West Hollywood* (1990) 223 Cal.App.3d 1342, 1351) so as to provide the property owner a fair return and then adjust those rents going forward to maintain that return. Courts have approved the selection of base years that significantly postdate the enactment of rent control. (See *MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 220–221, 223, fn. 4 [130 Cal.Rptr.2d 564] [base year of 1985 permissible even though ordinance was adopted in 1979].)

In the instant case, data for any year preceding the enactment of the ordinance was unavailable. Baar selected 1987 because that was the year Parkowner purchased Castle and presumably adjusted its purchase price to provide it with a fair return based on the rent levels in effect at the time. (See *Carson Harbor Village Ltd. v. City of Carson* (9th Cir. 1994) 37 F.3d 468, 476 [park owner lacked standing to allege rent control ordinance effected a facial taking because it purchased the park after the enactment of the ordinance and therefore "[t]he price paid for the property presumably reflected the market value of the property minus the interests taken"].)

Parkowner challenges the Board's conclusion that it had an opportunity in 1987 and in subsequent applications to rebut the presumption that it was receiving a fair return stated in section 2.18.410, but it did not do so.

Section 2.18.410 states, "[i]t will be presumed that application of this chapter and previous rent review ordinances has resulted in a fair rate of return. A park owner who believes that presumption can be overcome may apply to the city council for determination of the minimum increase necessary to produce a fair rate of return. Any such application must articulate the definition of fair rate of return under which the claim is being made and cite the authority which establishes that the existing return is less than the minimum fair rate of return. The application should also contain all such supporting information as is necessary for an accurate disposition of the application. If the application is successful, rents shall be increased to the minimum amount necessary to produce a fair rate of return."

"A presumption is an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established in the action. A presumption is not evidence." (Evid. Code, § 600, subd. (a).) "A statute providing that a fact or group of facts is prima facie evidence of another fact establishes a rebuttable presumption." (*Id.*, § 602.) However, in a comment to Evidence Code section 500, burden of proof, the Law Revision Commission stated, some "so-called presumptions [such as presumption of innocence or of sanity] do not arise from the establishment or proof of a fact in the action. In fact, they are not presumptions at all but are preliminary allocations of the burden of proof in regard to the particular issue. This preliminary allocation of the burden of proof may be satisfied in particular cases by proof of a fact giving rise to a presumption that does affect the burden of proof. For example, the initial burden of proving negligence may be satisfied in a particular case by proof that undamaged goods were delivered to a bailee and that such goods were lost or damaged while in the bailee's possession. Upon such proof, the bailee would have the burden of proof as to his lack of negligence. [Citation.]" (Cal. Law Revision Com. coms., Deering's Ann. Evid. Code (1995 ed.) foll. § 500, pp. 554-555.)

█ Although called a "presumption," what section 2.18.410 does is preliminarily allocate the burden of proof. Applying Evidence Code section 600 to section 2.18.410, the fact which is to be presumed—that application of the rent control ordinance resulted in a fair rate of return—is not triggered by "another fact . . . established in the action." (Evid. Code, § 600.) What section 2.18.410 does is establish a procedure for a park owner to challenge the current rent rate by requiring the park owner to initiate the process by submitting evidence showing that the current rent does not provide a fair rate of return.

Section 2.18.410 affects the burden of producing evidence because it operates to implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied. (Evid. Code, § 603.)[16] "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate." (Evid. Code, § 604.) In hearing Parkowner's application, Parkowner's evidence prompted the Board to present rebuttal evidence. City determined the issue on the evidence, not on the no-longer-operative presumption. It appeared from the record that Parkowner had an opportunity in 1987 and in subsequent applications to rebut the presumption that it was receiving a fair return, and it did so. It received rent increases. What Parkowner apparently did not do was raise the separate issue then whether 1987 should be used as the base year. Since Parkowner did not do so, but accepted the rent increases and applied for subsequent increases based on those numbers, the Board was entitled to rely on the presumption stated in section 2.18.410, "that application of this chapter and previous rent review ordinances has resulted in a fair rate of return."

Parkowner complains that the Board's reliance on Baar's opinion did not support the selection of 1987 as the base year. "Baar is an urban planner and an attorney. Baar does not have a degree or expertise as an accountant or economist, is not an MAI appraiser, is not a financial consultant, and does not undertake financial analysis as an expert."[17] "Baar has no expertise upon

---

[16] Initially we stated that section 2.18.410 establishes a presumption to implement a public policy other than to facilitate the determination of the particular action in which the presumption is applied (Evid. Code, § 605), namely policies stated by sections 2.18.110, subdivisions A through C, to protect mobilehome owners and 2.18.400 to ensure park owners a fair return. In a petition for a rehearing, appellant objected that the presumption as we analyzed it affected the burden of proof and was invalid as stated in *Fisher v. City of Berkeley, supra,* 37 Cal.3d 644. On further reflection, we recognize that unlike the extrinsic polices furthered by the ordinance in Fisher, the policies of sections 2.18.110 and 2.18.400 are not implemented by section 2.18.410, other than indirectly by streamlining the procedure for initiating a rent board hearing.

[17] The citation to Baar's résumé that Parkowner provides is actually the table of contents for volume two of the administrative record. This sloppy citation to the record is just one of many. (See Cal. Rules of Court, rule 14; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [85 Cal.Rptr.2d 521].)

which he could rely to conclude a park owner which has been subject to the Capitola Ordinance for eight years . . . could be presumed to be earning a fair return."

■ Baar's testimony was admitted as expert opinion evidence. (Evid. Code, §§ 801–802.) It is the function of the trial court or other presiding officer (*Cooper v. Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 945 [123 Cal.Rptr. 563]) to determine the qualifications of an expert, and the degree of his knowledge is a matter affecting the weight of his testimony, not its admissibility. (*People v. Stuller* (1970) 10 Cal.App.3d 582, 597 [89 Cal.Rptr. 158].) The essential questions which must be favorably answered to qualify a witness as an expert are two: Does the witness have the background to absorb and evaluate information on the subject? Does he have access to reliable sources of information about the subject? Two aspects of the witness's history are thus involved: the first, a subjective aspect, the capacity of the witness to understand and report; the second, an objective aspect, the witness's access and exposure to relevant data on the subject matter on which his opinion is sought. (*Naples Restaurant, Inc. v. Coberly Ford* (1968) 259 Cal.App.2d 881, 883 [66 Cal.Rptr. 835].)

Baar's résumé shows he has an impressive educational background, has filled visiting professorships and taught short courses and series of lectures, and spent 19 years consulting for such entities as the World Bank Regional Office in Budapest, Hungary, the Urban Institute, U.S. Aid for International Development, numerous California cities, The Institute for Transportation and Development Policy to East European Organizations, among others. He also acted as an expert witness on behalf of five cities and produced numerous publications and books. The Board did not err in admitting and relying on Baar's testimony; the court did not err in upholding the Board's decision.

## DISPOSITION

The judgment is reversed and the matter remanded for proceedings consistent with this opinion.

Rushing, P. J., and Duffy, J., concurred.

Petitions for a rehearing was denied June 16, 2006, and the opinion was modified to read as printed above.