MOORE, ACTING P. J.
*616 The parties appeal and cross-appeal a judgment after a jury trial in this business dispute. Plaintiff and cross-defendant Duncan E. Prince obtained a judgment of $647,706.48 against defendant and cross-complainant Invensure Insurance Brokers, Inc. (Invensure). Invensure took nothing on its cross-complaint against Prince and his related business entity, cross-defendant ERM Insurance Brokers, Inc. (ERM).
Invensure appeals from the judgment, arguing the trial court wrongly decided *889 issues related to the statute of limitations and numerous issues with respect to substantial evidence to support the judgment. It also claims the court abused its discretion when admitting certain evidence.
Prince and ERM also appeal from two postjudgment orders, arguing the court erroneously granted a motion to tax costs and to deny them attorney fees. We find the court erred with respect to the validity of Prince's offer to compromise under Code of Civil Procedure section 998,[1] and remand that issue for further consideration by the trial court. We authorize publication with respect to our discussion of this issue only.
*617 With respect to attorney fees, Prince argues he is entitled to attorney fees under Penal Code section 502. Invensure asserted a cause of action against him for violating this section, which includes an attorney fee provision. The court denied the motion, deciding the attorney fees under the Penal Code section 502 cause of action and the cross-complaint's remaining claims could not be apportioned. We disagree, concluding the causes of action in the cross-complaint all related to a common core of facts. Accordingly, we reverse the order denying attorney fees.
I
FACTS
A. Underlying Facts
As of 2003, Prince and Dick Fleming were the owners of an insurance agency, Prince & Fleming Insurance Brokers, Inc. (Prince & Fleming).[2] Prince focused on commercial insurance, while Fleming's specialty was life insurance and employee benefits. Similarly, Richard Sherman and Robert Parent were the owners of Sherman Parent Insurance Brokers (Sherman Parent). Their company did predominantly commercial property and casualty, personal home and auto, and employee benefits. Each of the four principals owned 50 percent of their respective agency.
In 2001 or 2002, representatives met and discussed a merger. They eventually hired Marsh, Berry & Company, Inc. (Marsh), to value both companies and assist in the merger. Marsh's initial report appraised Prince & Fleming at $3.2 million and Sherman Parent at $1.7 million as of December 31, 2002.
The companies discussed how to deal with the difference in valuation, but an agreement was not reached. The parties had agreed to have Marsh update its appraisal on the next year end date, December 31, 2003, and use that as the valuation date for tangible net worth. The initial appraisal date of December 31, 2002, would be used as a valuation date for the book of business.[3] Sherman later testified he agreed to this because he thought Sherman Parent's value had increased during 2003.
*618 The new appraisal valued Prince & Fleming at approximately $3.3 million, and Sherman Parent at approximately $1.5 million.
*890 Thus, Sherman Parent's value had actually decreased.
The companies decided to proceed with the merger anyway. Effective January 1, 2004, they entered into a contribution agreement to turn over all the stock in the respective companies to a new company, which eventually was named Invensure Insurance Brokers, Inc. In return, each principal received 25 percent of Invensure's common stock. The contribution agreement did not include an express provision addressing an adjustment for the value disparity between the two companies (disparity adjustment).
The parties concur that an agreement was reached on the disparity adjustment after the merger. On July 27, 2004, the parties met with Christopher Darst of Marsh, to discuss the matter. According to a letter from Darst to the principals, the agreement they reached was that Prince and Fleming would each receive an additional $125,000 each annually for six years. Prince's understanding was that the payments would begin sometime in the next 12 months following Darst's letter, which was dated August 6, 2004. No further actions were required by Prince or Fleming to be entitled to the payments. Thereafter, no objections were voiced by Sherman or Parent regarding this agreement. Both parties referred to this agreement as the "disparity note."
Invensure made the first payments to Prince and Fleming "at the end of 2004." They were paid through payroll. There were no payments in 2005, as agreed upon by the principals, due to decreased revenue. Prince and Fleming's understanding was that the payment would be made up later, and it was not their intent to waive the payment. From 2006 to 2009, Invensure made payments to Prince in various amounts, totaling $409,000, which included the 2004 payment. Assuming an agreement with Prince to pay $125,000 a year, the total Invensure owed to Prince for six years was $750,000, leaving a principal shortfall of $341,000.
In 2007, Fleming began talking about reducing his role in the business. In 2008, with the agreement of the remaining principals, Invensure paid Fleming the amount due under the disparity note. Prince testified that he, Sherman, and Parent agreed to pay Fleming eight percent in interest on the amount due. Fleming also testified that interest was paid on the amount due on the disparity note. Thereafter, Invensure bought out Fleming's interest in the company, leaving Sherman, Parent, and Prince each one-third shareholders.
By November 2011, Prince had started to fall out with his fellow principals, and expressed his interest in leaving Invensure and starting his own brokerage. Marsh was brought in to do an appraisal, and appraised Prince's *619 interest at $658,000. Marsh's reports also stated that Invensure still owned Prince "approximately $500,000" on the disparity note.
Attorneys for the parties began corresponding. On March 13, 2012, Thomas R. Kroesche, Invensure's attorney, sent a letter to R. Donald McIntyre, Prince's attorney, with proposed terms for a Letter of Understanding regarding Prince's departure from Invensure. McIntyre responded with some objections and questions on March 19. Kroesche replied with a counter-proposal on April 17. The letters were professional and did not appear to reflect that either party was contemplating litigation at the time.
Sherman and Parent agreed some money was due Prince under the disparity note. Sherman, with the help of an accountant, produced a spreadsheet entitled "Amortization Schedule of Duncan Prince Disparity Amount," which calculated the amount Invensure owed Prince at $485,357.61, which reflected the principal, *891 interest of eight percent for 60 months and three percent thereafter. (This spreadsheet was attached to the April 17 letter from Kroesche to McIntyre.)
Although Prince and Invensure seemed to substantially agree on many material points, negotiations did not lead to a sale of Prince's interest. Eventually, Invensure removed Prince from his director and officer positions, and fired him as an employee. During the time he was attempting to separate himself from Invensure, Prince founded ERM, a competing insurance brokerage.
B. Procedural History
Prince filed his initial complaint against Invensure for breach of contract, book account, and account stated on March 19, 2013. On July 1, he filed a first amended complaint (the complaint) stating the same three causes of action. The breach of contract claim was for alleged breach of the disparity note, and Prince attached the Marsh letter of August 6, 2004, as the written agreement. The remaining causes of action were different methods of pleading that Invensure owed Prince money on the disparity note.
Invensure cross-complained against Prince and ERM. We will discuss the cross-complaint in more detail in our analysis of the cross-appeal, but the common thread in its eight causes of action was unauthorized computer access and theft of trade secrets. Of the eight causes of action, four were submitted to the jury: breach of fiduciary duty; misappropriation of trade secrets ( Civ. Code, § 3426 et seq. ), violation of Penal Code section 502, and "breach of confidence." Invensure also asserted unauthorized computer access in its answer to Prince's complaint, alleging it was entitled to a setoff by way *620 of an affirmative defense. Further, Invensure asserted that Prince's claims had been filed after the statute of limitations had run.
At the conclusion of a trial that lasted five weeks, the jury returned a general verdict form with a unanimous verdict in favor of Prince in the amount of $647,706.48. Invensure took nothing on its cross-complaint. On Invensure's equitable claims, the trial court denied relief and awarded judgment to Prince and ERM. At Invensure's request, the court issued a statement of decision on the statute of limitations issue, which it had decided in Prince's favor. Invensure's motion for judgment notwithstanding the verdict or a new trial was subsequently denied.
Prince submitted a costs bill of $177,053.37, which included $134,682.53 in expert witness fees. Invensure filed a motion to tax costs, arguing, as relevant here, that Prince's expert witness fees were not recoverable. Prince responded that he had made a valid offer to compromise under section 998. The court granted the motion to reduce the expert fees by $129,409.58. Prince also sought attorney fees under Penal Code section 502, which the trial court denied.
Both parties filed appeals.
II
DISCUSSION
A. Invensure's Appeal**
B. Prince's Cross-Appeal
Prince has cross-appealed from two postjudgment orders. The first is an order partially granting a motion to tax costs brought by Invensure. The second is an order denying his motion for attorney fees under Penal Code section 502. Because Prince is the appellant for purposes of the *892 cross-appeal, he has the burden of demonstrating error.
1. Motion to Tax Costs
In his memorandum of costs, Prince included the amounts he spent on experts. Invensure then moved to tax costs. Among these costs were the *621 amounts Prince attributed to expert witnesses, who had mostly testified on issues relating to the cross-complaint.
Prince's claim to the expert expenses rested on two offers to compromise under section 998, the first dated January 24, 2014, and the second one dated March 11, 2014. Both used standard Judicial Council forms.
In the January offer, "Plaintiff: Duncan Prince" offered to have judgment entered in his favor and against "defendant" Invensure for $400,000. In the March offer, Prince as plaintiff offered to have judgment entered in favor and against "defendant" Invensure "for $500,000 on the First Amended Complaint only, each party bearing his/its own fees and costs." Neither offer was accepted. Neither offer made any mention of cross-defendant ERM.
The trial court granted the motion to tax in part. It limited Prince's claim for expert fees to the fees incurred for a single expert, Roberts, the certified public accountant, who had testified on Prince's damages for breach of contract and common counts on the amended complaint. The court ruled that "the first [ section] 998 offer is ambiguous and the second [ section] 998 offer only applied to [Prince's] complaint."
Two subdivisions of section 998 are at issue here, because Prince was both a plaintiff and a cross-defendant. As relevant here, section 998, subdivision (c)(1), provides: "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition ... the court or arbitrator, in its discretion, may require the plaintiff to pay a reasonable sum to cover postoffer costs of the services of expert witnesses ... actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the defendant." (Italics added.)
Section 998, subdivision (d), provides: "If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment or award ... the court or arbitrator, in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff, in addition to plaintiff's costs." (Italics added.)
" 'As recognized in numerous Court of Appeal decisions, the clear purpose of section 998... is to encourage the settlement of lawsuits prior to trial.' [Citation.] 'Section 998 achieves its aim by punishing a party who fails *622 to accept a reasonable offer from the other party. [Citations.]' [Citations.] 'In that situation, the prevailing party is precluded from recovering its own postoffer costs and must pay its opponent's postoffer costs, including expert witness fees, if awarded in the court's discretion. [Citation.] The purpose of the cost-shifting statute is to encourage the settlement of litigation without trial, by punishing the party who fails to accept a reasonable settlement offer from its opponent. [Citation.]' [Citation.]" ( Westamerica Bank v. MBG Industries, Inc. (2007) 158 Cal.App.4th 109, 129, 70 Cal.Rptr.3d 125.)
"We independently review whether a section 998 settlement offer was *893 valid. In our review, we interpret any ambiguity in the offer against its proponent. [Citation.] The burden is on the offering party to demonstrate that the offer is valid under section 998. [Citation.]" ( Ignacio v. Caracciolo (2016) 2 Cal.App.5th 81, 86, 206 Cal.Rptr.3d 76.)
Prince asserts the January offer was "to settle the entire action" for $400,000. It refers to e-mail correspondence between the attorneys asking about this very issue. Invensure's counsel stated that if the offer was intended to dispose of the entire action, it was rejected, but if referred only to the complaint, Invensure would like an additional week to consider the offer. Prince's counsel confirmed the offer was indeed intended "to dispose of the entire action."
In support of the court's order, Invensure cites general law about the strict construction of section 998 offers. (See, e.g., Garcia v. Hyster Co. (1994) 28 Cal.App.4th 724, 732-733, 34 Cal.Rptr.2d 283.) Those principles are logical and sound-the point of section 998 is to encourage the acceptance of fair settlement offers, not to allow one party to trap another into a potentially huge costs bill with an ambiguous offer. But nor do we interpret section 998 to honor form over substance. (See, e.g., Menees v. Andrews (2004) 122 Cal.App.4th 1540, 1544, 19 Cal.Rptr.3d 664 [rejecting an interpretation of section 998 that allows offering party to " 'game the system' "].) "In interpreting a section 998 offer, general contract principles apply when they neither conflict with nor defeat the statute's purpose of encouraging the settlement of lawsuits prior to trial." ( Westamerica Bank v. MBG Industries, Inc. , supra , 158 Cal.App.4th at p. 129, 70 Cal.Rptr.3d 125.)
This is such a case. Invensure correctly points out that "the offeree must be able to clearly evaluate the worth of the extended offer." This is correct. And that is what happened in this case, when Invensure inquired about whether Prince had intended to include disposing of the cross-complaint as part of the offer. "If the offeree is uncertain about some aspect of the offer ... he is free to explore those matters with the offeror, or even to *623 make counter-proposals during the period in which the statutory offer remains outstanding." ( Berg v. Darden (2004) 120 Cal.App.4th 721, 730-731, 15 Cal.Rptr.3d 829.)
Invensure claims the January offer was limited on its face to Prince as plaintiff, and not Prince as cross-defendant, and that the correspondence between counsel to clarify Prince's intent "created an ambiguity" by clarifying the offer was intended to apply to the entire action. We disagree. The clarification resolved any ambiguity; it did not create it. We decline to torture basic principles of logic any more than is absolutely necessary. Had Invensure accepted the offer, it would have disposed of the action, resulting in one single judgment. Prince's counsel's response to Invensure's counsel's inquiry that acceptance of the January offer would "dispose of the entire action" also removes any uncertainty that cross-defendant ERM was also intended to be included.[9]
In the context of this case, where two sophisticated parties are represented by counsel, allowing an offer to compromise to be clarified in writing after the offer was made serves the purposes of section 998.
*894 Such clarification encourages reasonable settlement offers to be accepted. Permitting a rule of overly strict construction of the language of the offer, despite the parties' actual knowledge of the other's intent, would frustrate this purpose rather than serve it. It would allow the party declining the (as hindsight demonstrated) very reasonable settlement offer to assert a "Gotcha!" defense to the statutory requirement to pay the offering party's postoffer costs. Here, the intent was clear. Invensure knew exactly what Prince was offering. It should not be able to escape the statutory mandate to pay Prince's costs after refusing the offer to compromise.
Accordingly, under basic contract law principles, we find the January offer was valid, and rejected by Invensure. We therefore remand this issue to the trial court for further consideration of the expert witness fees due Prince. Invensure raises several other issues with respect to recovery of expert fees, but we deem those best decided by the trial court in the first instance.
2. Attorney Fees*** *624 III
DISPOSITION
The postjudgment orders taxing costs and denying Prince and ERM's request for attorney fees are reversed and remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the judgments are affirmed. Prince is entitled to his costs on appeal.
WE CONCUR:
THOMPSON, J.
GOETHALS, J.

Subsequent statutory references are to the Code of Civil Procedure unless otherwise noted.

As we are required to do, we recite the facts in the manner most favorable to the judgment. (Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman (1998) 65 Cal.App.4th 1469, 1475, fn. 1, 77 Cal.Rptr.2d 479.)

As Marsh explained in a letter to the parties: "There are two components of value, the book of business value, which is a value of the agency's earning stream, and the tangible net worth value, which is a liquidation value of the balance sheet."

See footnote *, ante .

Invensure also argues, without citation to authority, that because Prince had separate counsel for the cross-action, his counsel for his role as "plaintiff" was not authorized to make the section 998 offer. There is, however, at a minimum, a rebuttable presumption that counsel had authority to make the offer (see Gagnon Co. v. Nevada Desert Inn, Inc. (1955) 45 Cal.2d 448, 459-460, 289 P.2d 466 ), and Invensure has offered nothing to rebut it.

See footnote *, ante .