Filed 4/20/21  McCarley v. Anesthesia Service Medical Group CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| STEPHANIE MCCARLEY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ANESTHESIA SERVICE MEDICAL GROUP, INC., et al., <br><br> Defendants and Appellants. | D074353 <br><br> (San Diego Super. Ct. No. 37-2014-0018445-CU-MM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Horvitz & Levy, S. Thomas Todd, H. Thomas Watson, Scott Dixler; Wilson, Elser, Moskowitz, Edelman & Dicker, and Robert W. Harrison for Defendants and Appellants.

Kenneth M. Sigelman & Associates, Kenneth M. Sigelman; Siminou Appeals and Benjamin I. Siminou for Plaintiff and Respondent.

Plaintiff and respondent Stephanie McCarley sued defendants and appellants Anesthesia Service Medical Group, Inc. (ASMG) and Dr. Edgar Canada, among others, for medical negligence, alleging she suffered a brain injury when Dr. Canada failed to take steps to raise her blood pressure while under anesthesia for a procedure. She made a Code of Civil Procedure section 998 offer to Dr. Canada, to which he did not respond.[1] The matter proceeded to trial, and McCarley obtained a judgment that included damages for future attendant care and prejudgment interest based on the section 998 offer.

Defendants appeal. They contend Dr. Canada was within the standard of care as a matter of law; the trial court improperly excluded proposed expert testimony regarding polycystic ovary syndrome (PCOS); the award of future attendant care was based on speculation; and the section 998 offer was invalid. We conclude substantial evidence supports the jury's negligence finding and the future attendant care award, and defendants do not establish exclusion of the expert testimony was reversible error. We further conclude defendants forfeited their section 998 argument. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

I.    *Underlying events*

On March 21, 2013, McCarley went to Rady Children's Hospital for an endoscopy, a nonsurgical procedure to examine the digestive tract. At the time, she was an 18-year old high school senior, and had been diagnosed with PCOS approximately three years earlier. Gastroenterologist Neelish Tipnis

---

[1]    Statutory references are to the Code of Civil Procedure unless otherwise noted.

performed the endoscopy, and Dr. Canada was the anesthesiologist. Among other drugs, Dr. Canada used an inhaled anesthetic, sevoflurane.

Anesthetic drugs can cause blood pressure to drop. Systolic blood pressure measures the pressure as the heart beats and squeezes blood out, while diastolic pressure measures the lowest point before the next beat. They can be combined into mean arterial blood pressure, or MAP, expressed in millimeters of mercury (mmHg). During and after the procedure, McCarley's MAP was in the 50 mmHg range for at least 40 minutes (at one point dropping slightly below that range).

The brain is capable of autoregulation, or maintaining even cerebral blood flow, for a certain range of blood pressure. The parties' experts agreed the upper limit was 150 mmHg, but disagreed as to whether the lower limit was 50 or 70 mmHg, as we discuss *post*. The experts referenced medical texts, which we briefly summarize here. Miller's Anesthesia contains a chapter by Piyush Patel and John C. Drummond that addresses autoregulation, stating in part:

> "In normal human subjects, the best available data—and they are limited—are consistent with the limits of autoregulation occurring at MAP values of approximately 70 and 150 mm Hg . . . . The lower limit of autoregulation (LLA) has been widely quoted as an MAP of 50 mmHg. Although this number may be correct for some animal species, the data available argue that the LLA is considerably higher in humans . . . ."

Cottrell and Patel's Neuroanesthesia, by James E. Cottrell and Piyush Patel, also addresses autoregulation. It states in part:

> "Traditionally, many textbooks report that CBF [cerebral blood flow] is maintained relatively constant within the range of [MAP] from approximately 50 to 150 mmHg . . . . However, several investigators have noted that most available evidence suggests that . . . the lower limit of

3

autoregulation in humans is substantially higher on average than 50 mmHg (at least 70 mmHg) . . . . As a consequence . . . , caution is advised when using these traditional values . . . ."

Both textbooks cite a 1997 letter from Drummond to the editor of Anesthesiology (Journal of the American Society of Anesthesiologists), titled, "The Lower Limit of Autoregulation: Time to Revise Our Thinking?" There, he stated the "popular conception regarding the normal lower limit" of 50 mmHg "may be substantially in error," noting it was likely based on data originating in the 1950's. He stated more recent data supported a limit of 70 mmHg, and "it may be appropriate for our community to adjust its thinking . . . ."

McCarley's family reported behavioral changes after she awoke from the procedure, including acting silly and laughing uncontrollably. At the same time, she became much better at art. McCarley returned to Rady a few days later for an evaluation, but the cause of her altered behavior was unclear.

She and her family would later report many other issues, including diminished speech processing, concentration and focus problems, short-term memory loss, severe fatigue, headaches, insomnia, and an increased heart rate and heat intolerance (which would lead to a diagnosis of dysautonomia, a nervous system disorder). She started seeing a neurologist, Dr. Michael Lobatz. He diagnosed her with cognitive dysfunction, and she attended a brain injury rehabilitation program that he directed. He later determined her symptoms were caused by an anoxic brain injury during the endoscopy. Some of the symptoms improved or resolved and certain therapies helped, but she eventually plateaued.

4

McCarley had been conditionally accepted to California State University San Marcos, but she did not pursue this plan. After graduating high school with help from her teachers, she took one or two art classes a semester at Palomar College. Her family drove her to class and helped with her daily needs.

II. *Litigation*

In June 2014, McCarley filed a complaint for medical malpractice against Dr. Canada, ASMG, Dr. Tipnis, and Rady. In March 2015, McCarley made a section 998 offer to Dr. Canada, to which he did not respond. We discuss the section 998 offer in more detail *post*. Dr. Tipnis and Rady later moved for summary judgment, which the trial court granted.

The case proceeded to a jury trial in January 2018. During voir dire, defense counsel asked whether anyone had familiarity with PCOS. In McCarley's opening statement, her counsel told the jury PCOS was a term that "may come up," and explained it was a "hormonal imbalance syndrome . . . ." Defense counsel addressed PCOS in his opening statement too, stating McCarley was diagnosed with the condition before the procedure and its significance was lost on her treating physicians. He was "confident" Dr. Sherry Franklin, an endocrinologist who treated McCarley, would "allow that had she thought about [PCOS] . . . , she would have acknowledged . . . it was associated prominently with fatigue." He further stated depression and other issues were connected to PCOS, and "[t]his is reinforced, you'll learn, in medical literature . . . and from the experts who deal with PCOS," indicating they were endocrinologists like Dr. Franklin. He later said psychiatrist Dr. Jeffrey Max would tell the jury McCarley has depression and it "may be attributable" to PCOS as "one of the underlying components . . . ."

5

The jury heard extensive witness testimony, which we now summarize.

A.    *Treating physicians*

Dr. Canada testified his understanding was that the MAP range for cerebral autoregulation was 50 to 150 mmHg.  He stated a lower limit of 65 or 70 mmHg was not consistent with his education and training, but acknowledged there was "some debate" as to the limit.  When asked about the Patel and Drummond chapter in the Miller textbook, he stated Drummond "raise[d] a question" of whether the limit should be higher than 50 mmHg; thought it was "one opinion"; and disagreed it "altered the standard of care."  He noted both that textbook and the Cottrell textbook cited Drummond's 1997 letter, which opined the standard should be changed, and suggested Cottrell was "not totally sold . . . that 70 [mmHg] is the lower level . . . ."

Dr. Canada further testified none of McCarley's MAP or blood pressure values caused him alarm, and nothing in his training or experience led him to see a need to take action.

Dr. Lobatz, McCarley's neurologist, opined she suffered a brain injury due to her blood pressure being too low, for too long, while under anesthesia for the endoscopy.  He acknowledged he could be wrong, but could not find another explanation.  He also testified she was impaired in executive functioning, which impacted higher mental function; had growth hormone deficiency (which eventually resolved); and was no longer safe to drive.

Addressing future care, Dr. Lobatz stated that for "mobility, her movements, her ability to bathe, dress, and groom, feed herself, things of that nature, all those basic activities of daily living are independent.  Cognitively, not so, about 50/50."  He later reiterated this testimony, but deferred to other experts on the need for full-time care:

> "So from a neurological perspective that is she can walk,
> she can talk, she can dress, bathe, and groom herself, I

think from that particular perspective she does not really need attendant care. Perhaps a supportive living environment because of the fatigue in particular would be good, but not necessarily 24/7 care. As far as her cognitive difficulties and all of the problems related to that, I do understand the idea that you would need 24/7 care under those conditions. And in that case, though, I defer to Dr. Colarusso and Dr. Markel."

McCarley's counsel asked Dr. Lobatz if he had followed patients with PCOS. He said he did so a "number of times," explaining neurologists are "pretty well versed in [PCOS]" because some of their medicines, including one called Depakote, are "thought to cause polycystic ovaries." Her counsel then asked if he had an "opinion with reasonable medical probability as to whether [PCOS] has played any role" in McCarley's symptoms. The trial court overruled a foundation objection by defendants, and Dr. Lobatz responded, "I don't think it's involved at all. I think it's ridiculous, frankly." He acknowledged fatigue, heat intolerance, and insomnia could be associated with PCOS, but he had never seen an association with cognitive issues or dysautonomia. When asked if he had reviewed the literature on PCOS, in connection with the questions about cognitive issues and dysautonomia, he stated he had not.

Dr. Franklin testified she saw McCarley for the growth hormone issue. She gave her growth hormone to help her feel better, but had never seen pituitary insufficiency from an anoxic brain injury and was unsure if McCarley needed it. The trial court conducted a section 402 hearing to assess her testimony on PCOS and growth hormone.[2] Dr. Franklin said she would

---

[2] Evidence Code section 402 provides a procedure for the trial court to determine the admissibility of evidence outside the jury's presence.

7

have to search the literature, but was not aware of any direct link between them. The court ruled she could not say anything about PCOS, beyond what McCarley may have reported to her.

Other doctors who treated McCarley also testified, and were also asked about PCOS. Neurologist Michelle Sahagian saw her during the evaluation at Rady and shortly thereafter. When defense counsel asked if she considered whether PCOS could explain the fatigue, she stated she had not done so and did not know if fatigue was associated with PCOS. Psychiatrist Ellen Heyneman also saw McCarley at Rady. McCarley's counsel asked if PCOS was something she considered, and she said it "[did not] appear to be . . . ." McCarley's cardiologist, Todd Hitchcock, told defense counsel he was "not very familiar" with PCOS and was unable to say if it was associated with dysautonomia.

B.    *McCarley's expert witnesses*

Anesthesiologist William Wilson testified the lower limit for autoregulation was "about 70" mmHg. He cited Miller, stating it was the "most authoritative and widely read" anesthesiology textbook and it said this was the "accepted lower level. . . ." He acknowledged there were texts indicating a different floor was acceptable, but testified that by March 2013, "it was very established" the lower limit was 70 mmHg, not 50 mmHg. He further testified that if MAP drops below 70 mmHg, the standard of care requires taking steps to raise blood pressure above 65 mmHg, such as by decreasing inhaled anesthesia or administering a vasoconstricting agent. He opined Dr. Canada fell below the standard of care, by assuming autoregulation set in at 50 mmHg and not taking steps to raise McCarley's blood pressure. In addition, Dr. Wilson testified that because McCarley's MAP was allowed to remain significantly below 70 mmHg for over 40

minutes, she most likely suffered a "hypoperfusion ischemic brain injury . . . ."

Dr. Daniel Silverman is a specialist in nuclear medicine, which encompasses radioactive imaging. A PET (or positron emission tomography) scan is a special kind of imaging study. He explained each part of the brain has a metabolism level, and when looking at a scan, he assesses if activity in a part is within normal range. Dr. Silverman found two areas with hypermetabolism in a June 2013 PET scan of McCarley: one involving interpretation of visual input, and the other involving speech. He opined there was significant injury to those areas, due to insufficient oxygen while under anesthesia.

Neuropsychologist Nancy Markel gave McCarley a battery of tests that examine brain functioning, and found they showed "really solid cognitive abilities . . . ." She addressed her low scores on certain easy tests and better scores on harder ones, explaining the inconsistency could be explained by the PET scan (stating, in part, that hypermetabolism made "her able to do something which shouldn't have been that easy.") Dr. Markel opined McCarley had suffered a brain injury. She agreed she had "excellent cognitive scores," but said the "question . . . becomes . . . are you able to use [those cognitive skills] when and if you need them" and she "is not." Dr. Markel further testified the brain injury "impacted [McCarley's] ability to function day-to-day" and there was "no way that she should be left alone." She opined McCarley needed full-time attendant care, due to "the combination of . . . what happens in an emergency and also she clearly has some days that are better than others." She elaborated that on bad days, she could not function and was "basically on the couch, useless."

9

Defense counsel asked Dr. Markel if she had heard of PCOS. She said her foundation was limited and she was mostly aware of associated physical attributes, but had "read in the literature that there can be some mood disturbances, not always in every case."

Psychiatrist Calvin Colarusso testified he diagnosed McCarley with "major neuropsychological disorder with depression," resulting from brain injury. He opined she would never function independently, and should not be alone for "any extended period," agreeing the concern was if "an emergency arose." He continued, stating "she leaves the stoves on and there are lapses in judgment that require the presence of another adult who can see that she gets through the day without serious difficulty." He acknowledged he was not "aware of any lapses. . . where she did something dangerous or inappropriate . . . ." Dr. Colarusso also noted her executive functioning was impaired and she "needs help in planning and being able to follow through with daily activities."

Dr. Colarusso criticized Dr. Max for saying her symptoms "didn't result from . . . brain damage," "rais[ing] a question" of PCOS, and saying it was "often accompanied by depression and other . . . symptoms." He stated, "I'm not an expert on that syndrome; neither is he" and "there's no evidence . . . [she] had any depressive or other kinds of symptoms whatsoever prior to the surgery." He was aware symptoms occurred with PCOS, and "[d]epression in particular" was a feature.

C.    *Defense expert witnesses*

Pediatric anesthesiologist Gregory Hammer opined Dr. Canada did not deviate from the standard of care. He testified that "for a period of minutes or tens of minutes, having [a MAP] of 45 or 50 is undoubtedly safe in a young,

10

healthy teenager," but agreed there was a debate about the limit of autoregulation.

Dr. Harry Chugani testified for defendants on PET scans. He found McCarley's PET scan normal, explaining hypermetabolism from brain injury "lasts no more than a few days" and he had never seen it one or two months down the road. His opinion was that she did not suffer a brain injury. In addressing his reasons for this opinion, he noted she had PCOS and it "can be associated . . . with a neuropsychiatric symptom," but acknowledged he was not a PCOS expert and could not testify it caused her symptoms. He did "entertain[] [the] possibility" the symptoms related to PCOS, stating it "would be wrong to put . . . everything that's wrong with her, including anything that's preexisting, and say this is all related to anesthesia."

Neuropsychologist Dean Delis administered similar tests as Dr. Markel, and opined McCarley "does not have cognitive deficits or brain damage." He testified her inconsistent test scores were evidence of "depression," not brain damage, explaining you "can't accidentally get a high score." Dr. Delis also testified McCarley had "somatic symptom disorder" (formerly somatoform disorder), which can involve abnormal thoughts in response to symptoms. He explained she was reporting symptoms "completely inconsistent with her great cognitive test scores," and he thought she was "convinced . . . she is dysfunctional from a brain damage perspective." He "highly disagree[d]" she needed full-time attendant care, citing her "very strong" cognitive skills.

Dr. Max, defendants' expert psychiatrist, testified McCarley has a "major depressive disorder . . . ." He stated her "sleep problems, appetite problems, fatigue or energy problems, poor concentration or slower thinking, and . . . some weight loss" were symptoms of depression. He thought that

11

after the endoscopy, she experienced "hypomanic symptoms," which is "the other pole of depression." He testified that with "treatment of her depression, . . . and shifting away from a permanent brain injury model," she could gain function and be independent. McCarley successfully moved to preclude him from testifying on PCOS, which we address *post*.

D.     *Testimony by McCarley, her family, and others*

McCarley testified she felt strange when she woke from the endoscopy, and described her symptoms and limitations, including being unable to play sports, ride horses, or attend church mission trips.

Lori McCarley, her mother, testified family members spent about two hours a day assisting her with tasks like laundry, cleaning her room, and preparing meals. She also drives her to and from her art classes, and reminds her to drink water and take medicine. She said McCarley had been home alone only a handful of times. She also had concern about McCarley using the stove safely, as she "came into the kitchen one time and the stove was still on . . . ."

Michael McCarley, her father, testified they no longer had long talks on topics like science, politics, and theology, and she spent most days inside from fatigue or to avoid heat. One of her sisters, Kali Behneman, testified McCarley had trouble making change when assisting her at the farmer's market and could become so exhausted she would not eat or drink (which she saw "hundreds of times").

McCarley's high school English teacher, Emily Wilson, testified she had been one of the highest achieving students in her class, but after the procedure, there were differences in her work quality and she gave her accommodations. Pastor Chico Goff testified McCarley had attended church

youth services and volunteered, but after March 2013, did not participate as fully.

E.    *Verdict and judgment*

At the conclusion of the evidence, the trial court gave the jury instructions, including CACI No. 219, which states in part, "You do not have to accept an expert's opinion. . . . You may believe all, part, or none of an expert's testimony." The court also gave CACI No. 506: "An anesthesiologist is not necessarily negligent just because he chooses one medically accepted method of treatment or diagnosis and it turns out that another medically accepted method would have been a better choice."

During closing arguments, defense counsel pointed out CACI No. 506 to the jury. McCarley's counsel argued in part that defense counsel promised "somebody was going to tie all of this to PCOS" and he "had no expert who came in to talk about that"

The jury deliberated for three days. They requested, among other things, the testimony by the standard of care experts and clarification on whether a juror's vote defaulted to defendant if they were unsure (and were told "[e]ach juror should decide the case based on his/her review of the evidence.") The jury found Dr. Canada was negligent and his negligence was a substantial factor in causing injury to McCarley, in each case by a 9-3 vote. They awarded $83,395 for past medical care, $5,582,973 for future care, $2,500,000 for lost earnings, and $5,000,000 for noneconomic losses. The parties agree the future care award reflected approximately 10-14 hours per day of attendant care, along with medical care.

The trial court reduced noneconomic damages to $250,000 under Civil Code section 3333.2, over McCarley's objection. The court entered judgment in the amount of $8,416,368, and added $2,552,579.05 in prejudgment

13

interest against Dr. Canada based on the section 998 offer.  After moving unsuccessfully for a new trial, defendants timely appealed.

DISCUSSION

I.    *Standard of Care*

Defendants contend the jury's negligence finding was in error, because Dr. Canada was within the standard of care as a matter of law.  We disagree, and conclude there is substantial evidence to support the finding.

A.    *Applicable law*

In order to prove a claim of medical malpractice, the plaintiff must establish the defendant breached the standard of care, which "requires that medical service providers exercise that reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances."  (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 215 (*Alef*).)  "The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of laymen."  (*Ibid*.)

We review the sufficiency of the evidence supporting the jury's verdict for substantial evidence.  (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188; see *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501 [review of a judgment following a jury verdict "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the [jury's] factual determinations"]; *People ex rel. Brown v. Tri-Union Seafoods LLC* (2009) 171 Cal.App.4th 1549, 1567 [we "view the evidence in the light most

14

favorable to the prevailing party, drawing all reasonable inferences and resolving all conflicts in its favor"].)

B.    *Analysis*

Based on our review of the entire record, we conclude substantial evidence supports the jury's finding that Dr. Canada was negligent.  There is no dispute McCarley's blood pressure, as measured in MAP, was in the 50 mmHg range while she was under anesthesia for her endoscopy, and Dr. Canada did not try to raise it.  The contested issue was whether this constituted a breach of the standard of care.  Dr. Wilson, McCarley's standard of care expert, testified it did.  Specifically, he explained the lower limit for autoregulation was 70 mmHg, citing the Miller textbook, and that if it drops, the standard of care requires taking action to raise it above 65 mmHg.  He opined Dr. Canada fell below the standard of care by assuming 50 mmHg was sufficient and not taking such steps.  This expert testimony provides substantial evidence for the jury's finding of negligence.  (See *Alef*, *supra*, 5 Cal.App.4th at p. 215.)

Defendants contend they prevail on negligence as a matter of law, because "uncontradicted evidence" establishes that using a lower limit of 50 mmHg is "widely accepted" and negligence cannot be based on using one of multiple accepted methods.  But their evidence for a 50 mmHg limit, including from Dr. Canada and Dr. Hammer, was both contradicted and impliedly rejected by the jury, rendering their arguments about alternative methods inapposite.  Dr. Wilson testified it was "very established" by March 2013 that 70 mmHg was the lower limit, expressly disagreeing with a 50 mmHg limit and effectively denying there was any present debate.  The jury was entitled to accept this testimony and reject the defense witnesses' view that 50 mmHg was an acceptable option, and its negligence finding makes

15

clear it did so. (See *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633 [jury "must give to each [expert] opinion the weight which it finds that opinion deserves"]; *People v. Sanchez* (2016) 63 Cal.4th 665, 675 [jury is "not required to accept an expert's opinion"]; CACI No. 219 [instructing jurors they do not have to accept expert testimony].) In turn, as explained *ante*, Dr. Wilson's testimony provides substantial evidence for that finding.[3]

## II. *Exclusion of Testimony by Dr. Max on PCOS*

Defendants next argue the trial court erred by precluding Dr. Max from testifying on PCOS. They do not establish reversible error.[4]

### A. *Applicable law*

An expert witness must have "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) " '[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard*).) The testimony must also be "sufficiently beyond common experience" to "assist the trier of fact" and based on "matter . . . of a type" reasonably relied upon by one opining on

---

[3] Given our conclusion, we need not reach the parties' remaining arguments here, including defendants' reliance on cases involving alternative methods and McCarley's contentions regarding cerebral perfusion pressure.

[4] McCarley contends defendants forfeited this issue because their counsel told the trial court they did not intend for Dr. Max "to offer [a] medical causation opinion" on PCOS. Defendants explain counsel misremembered the deposition, and the court reread the testimony before ruling. We do not view this as an unambiguous, binding concession. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.)

the subject at issue.  (Evid. Code, § 801, subd. (a)-(b).)  "The essential questions which must be favorably answered to qualify a witness as an expert are two:  Does the witness have the background to absorb and evaluate information on the subject? Does he have access to reliable sources of information about the subject?"  (*Los Altos El Granada Investors v. City of Capitola* (2006) 139 Cal.App.4th 629, 658 (*Los Altos*).)

We review a ruling to limit or exclude expert testimony for abuse of discretion.  (*Sargon Enterprises v. Univ. of Southern California* (2012) 55 Cal.4th 747, 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it' "].)  An " 'erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Serri v. Santa Clara Univ.* (2014) 226 Cal.App.4th 830, 857 (*Serri*); *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*) [probability " 'in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility' "].)

B.    *Additional facts*

Dr. Max testified at his deposition that he planned to opine McCarley's "depression and mental problems . . . are more than likely" related to PCOS and "much less likely to be related to . . . anoxia from anesthetic, which is so rare that none of the experts in this case . . . has ever seen a case."  He felt her doctors only considered "brain damage from anesthesia" and this was "overly narrow," but agreed anoxic brain injury could cause major depressive disorder.  He testified the medical literature on PCOS reflected "hundreds of articles" showing increased depression and bipolar disorder, and "even a link" with dysautonomia.  He also testified that, if you consider she has PCOS,

17

"many of her symptoms are understandable, and you don't have to invoke somatoform disorder."

Dr. Max acknowledged he was not an expert in PCOS, and stated he reviewed the literature in forming his opinions. When asked if had treated patients for issues related to PCOS, he replied his "connection . . . comes from psychiatric literature where treatment of [b]ipolar disorder patients, especially adolescents, becomes tricky if one decides to use Valproic acid or Depakote because . . . that medicine can increase their rate and risk of [PCOS]." He had seen patients "in that regard," and had depression patients with a history of PCOS, but did not recall patients coming to him "for [PCOS], saying . . . they're depressed because of that." Dr. Max also acknowledged McCarley was diagnosed with PCOS before the procedure, previously functioned at a higher level, and had not formally complained of psychiatric issues in the past, but explained that from his "readings of [the PCOS] literature . . . symptoms can be silent" and "onset . . . can be years later."

McCarley's counsel filed a motion in limine to preclude Dr. Max from providing causation testimony regarding PCOS, which defendants opposed. The trial court elected not to rule at the outset of trial, stating if it "had to make a ruling now . . . it would be very easy," but the "best thing to do" was "see how the evidence flows." The court did note Dr. Max's testimony that he was not an expert, and said, "I will say for the defense, that is a great concern for the Court."

When the trial court revisited Dr. Max's testimony, defense counsel argued in part that Dr. Lobatz was permitted to testify about PCOS after offering the "same testimony" on Depakote as Dr. Max. The court said it was "getting very concerned when I hear he's not an expert and then he's going to

18

say, well, PCOS has fatigue, et cetera . . . and therefore it goes over to PCOS," but acknowledged it had to consider Dr. Lobatz discussed it. The next day, the court stated it reread the deposition transcript twice and ruled Dr. Max could not testify "PCOS was the cause of the condition that Ms. McCarley has now." It explained that "without . . . more foundation than I've read some literature, more foundation about PCOS and how it would be connected to this brain injury, I'm going to not allow it." Defense counsel argued their position was not that PCOS was "definitively" the explanation, but that there was no brain injury, and they were being "hand-tied" from establishing other explanations. The court replied that Dr. Max's deposition reflected "he's not even sure of it" and "wouldn't even make that diagnosis," concluding "I just don't think there's enough here for that type of testimony."

C.    *Analysis*

The trial court could reasonably conclude Dr. Max lacked the qualifications to offer causation testimony as to PCOS, regardless of the medical literature he consulted. The record reflects he lacked the background to evaluate that literature or otherwise offer expert testimony on PCOS. (*Los Altos*, *supra*, 139 Cal.App.4th at p. 658; *Howard*, *supra*, 208 Cal.App.4th at p. 1115.) Dr. Max is a psychiatrist. He admitted he was not an expert on PCOS and had not treated patients for issues caused by it; rather, his familiarity was based on prescription risks from the psychiatric literature and patient histories. The court was also cautious in exercising its discretion, including deferring its ruling until more evidence came in and reading the deposition twice. We cannot say the court's decision to exclude Dr. Max's testimony on PCOS was either irrational or arbitrary. (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

19

Defendants do not persuade us to reach a different conclusion. First, they contend the trial court "erred when it ruled that Dr. Max could not base his opinion about PCOS on medical and scientific literature." The court made no such ruling, and there is no dispute qualified experts may rely on literature. (See *Brown v. Colm* (1974) 11 Cal.3d 639, 644 (*Brown*) [a physician "may rely upon medical texts as the basis for his testimony"].) Rather, having previously found Dr. Max was not an expert, the court explained his proposed testimony would require "more foundation than I've read some literature, more foundation about PCOS and how it would be connected to this brain injury." The issue was not that Dr. Max relied on articles, but that he *solely* relied on articles in the absence of any expertise or experience with PCOS. (See *Los Altos*, *supra*, 139 Cal.App.4th at p. 658 [expert must have both reliable sources and the "background to absorb and evaluate information"].)

The cases cited by defendants here do not support reversal. They involve experts with sufficiently relevant experience or testimony that was admitted, not excluded, and are distinguishable. (See, e.g., *Brown*, *supra*, 11 Cal.3d at p. 647 [trial court erred by excluding testimony by surgeon who performed corrective surgery ten years after surgery at issue and who reviewed literature as to earlier standard of care, on sole ground he was not yet in practice at the time]; *People v. Catlin* (2001) 26 Cal.4th 81, 132-133 [no error in allowing seasoned pathologist who conducted autopsy and studied

20

literature on poison at issue to opine it was the cause of death, where, among other things, he had "sufficient specialized training"].)[5]

Accordingly, we also reject defendants' related argument that "[b]ecause Dr. Max had 'disclosed sufficient knowledge,' " his testimony should have been admitted and subjected to cross-examination. (Cf. *Brown, supra*, 11 Cal.3d at p. 646 [expert who meets "general testimonial qualification[s]" can be subject to "penetrating . . . cross-examination"].)

Second, defendants contend the "trial court was mistaken that Dr. Max did not make a diagnosis of depression associated with PCOS," stating it was somatoform disorder that he would not diagnose. We disagree with their interpretation of the court's comments. When the court noted Dr. Max was "not even sure" and would not "make a diagnosis," it did not mention depression and had already determined he could not testify on PCOS. The court was responding to defense counsel's argument that they were being prevented from establishing a cause besides brain injury, and its concern appeared to be that Dr. Max did not say PCOS caused her condition—only that it was more than likely related to it. If anything, doubts as to the

---

[5]    (See also, e.g., *People v. Chavez* (1985) 39 Cal.3d 823, 827-829 [not "entirely free from doubt," but no abuse of discretion in allowing pathologist who conducted victim's autopsy, reviewed numerous post-mortem blood tests, and was familiar with literature to testify about defendant's actions while inebriated]; *Miller v. Silver* (1986) 181 Cal.App.3d 652, 661 [plastic surgery case; error to exclude psychiatrist's testimony about antibiotics due to lack of expertise in plastic surgery, as testimony on "matters within the knowledge . . . of every physician" can "aid the trier of fact"]; *People v. Phillips* (1981) 122 Cal.App.3d 69, 78, 85-89 [no error in admitting expert testimony that mother accused of murdering child had Munchausen's syndrome by proxy, even though expert relied on literature and had not treated such patients; her challenge was not based on his qualifications, but on her claim that the syndrome was not accepted by the profession].)

certainty of his opinion would support exclusion and, regardless, this was not the court's primary reason for its ruling. (See *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [expert opinion based on conjecture has "no evidentiary value"].)

Third, defendants contend the trial court improperly rejected a foundation for Dr. Max's testimony that it accepted for Dr. Lobatz, especially as only Dr. Max reviewed the PCOS literature. This argument lacks force. Even assuming their testimony had similarities (and we note it was not identical), they offered their testimony in different roles. Dr. Max specifically sought to give expert testimony on PCOS, whereas Dr. Lobatz testified primarily as McCarley's neurologist—and was one of many witnesses asked about their consideration of PCOS, or lack thereof. Further, the trial court acknowledged defendants' concerns about Dr. Lobatz's testimony, thus giving them due consideration. We conclude the court's treatment of Dr. Max's proposed expert testimony on PCOS was reasonable and within its discretion.

Even if the trial court erred, defendants do not establish there was a reasonable chance of a more favorable result. (*Serri*, *supra*, 226 Cal.App.4th at p. 857; *Cassim*, *supra*, 33 Cal.4th at p. 800.) McCarley offered expert testimony that her condition was caused by a brain injury. Dr. Max would have testified McCarley's depression and other symptoms were more than likely related to PCOS, and her doctors failed to consider it. But the jury already heard most of this. Defendants' experts disagreed she had a brain injury; multiple witnesses, including McCarley's expert Dr. Colarusso, testified she had depression; and Dr. Max opined her problems were depression symptoms. Witnesses also noted PCOS had symptoms like fatigue and mood disturbances, and Dr. Chugani entertained it as a possible cause—all while her doctors acknowledged they did not consider it. And

22

Dr. Colarusso actually related Dr. Max's views that her symptoms were not caused by brain damage and PCOS was often related to depression and other symptoms, in criticizing them. Finally, defendants concede the symptoms appearing "after her procedure, some three years after her PCOS diagnosis" impacted its likelihood as the explanation.

On this record, we cannot conclude defendants could have achieved a more favorable result, had Dr. Max been permitted to testify on PCOS.

Defendants' arguments are again unpersuasive. First, they contend this was a close case on "both negligence and causation," citing the 9-3 votes, the three days of deliberations, and the jury's notes. Dr. Max's proposed PCOS testimony only pertained to causation and, whatever the vote, Defendants do not establish it would have made a difference.

Second, defendants argue they were "prevented from making sense" of the references to PCOS without Dr. Max's proposed causation testimony. They further contend the jury could have concluded defendants were "blowing smoke," noting McCarley's closing argument point that they failed to produce a PCOS expert. We disagree the references were confusing, or that Dr. Max's testimony would have assuaged jury concerns in this regard. Defense counsel raised PCOS in voir dire, and both parties addressed it in opening statements; this provided context for the references, regardless of whether defendants presented all the evidence they wanted. Defense counsel did promise a PCOS expert in his opening statement, but focused on Dr. Franklin, the endocrinologist—mentioning only later that Dr. Max would discuss depression and its link to PCOS. Even if Dr. Max had testified on PCOS, the jury could still have wondered why Dr. Franklin did not.

Third, defendants cite Dr. Lobatz's statements on PCOS, including that he could not find an explanation for her condition besides brain injury, and

23

argue, "Dr. Max would have provided the alternative explanation . . . ." But other doctors also testified she experienced brain injury, and the jury heard about depression as an alternative—including from Dr. Max.

Finally, defendants acknowledge the jury could have concluded McCarley had depression, but contend they were "prevented from learning" Dr. Max did not agree with Dr. Colarusso that brain injury was the cause. Not so. Although Dr. Max could not testify about PCOS, his testimony still reflected he viewed brain injury as the wrong explanation. Further, as noted above, Dr. Colarusso himself told the jury Dr. Max rejected brain damage as the cause of her symptoms.

III. *Future Attendant Care*

Defendants assert the damages award for future attendant care must be reversed because it was based on speculation, not evidence. We disagree.

A. *Applicable law*

A plaintiff may recover damages for detriment "reasonably certain" to occur in the future. (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97; see *J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 343 (*Carlsbad Unified*) [future medical expenses can be based on lay or expert testimony].) " ' "[D]amages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." ' " (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 896.) That said, " ' "[d]amages . . . are difficult to measure in personal injury cases." ' " (*Carlsbad Unified*, at p. 343.) "The task of measuring such damages falls to the jury . . . and its resolution of disputed issues of probability and extent of harm will be affirmed if supported by substantial evidence." (*Ibid*.)

B.    *Analysis*

Resolving all evidentiary conflicts in favor of the judgment, as we must, the record contains substantial evidence to support damages for future attendant care.  Dr. Markel testified McCarley should not be left alone, given her inability to handle an emergency and the unpredictability of days when she is "basically . . . useless."  She had also noted McCarley had impaired functioning and could not use her cognitive skills when needed.  Dr. Colarusso likewise opined she would never be independent.  He expressed similar concern about emergencies, and also cited her limited planning ability and "lapses in judgment" that required another adult's presence, like "leav[ing] the stoves on."  In addition, McCarley's family testified about her extreme fatigue, forgetting to drink water and take medicine, and difficulty processing basic transactions.

This testimony presents a picture of a young woman who may have some days that are better than others, but would not be able to consistently function as an independent adult.  The jury was entitled to rely upon it to award future attendant care damages.  (Cf. *Carlsbad Unified*, *supra*, 232 Cal.App.4th at p. 343 [jury could award future medical costs "based on the evidence, both lay and expert, of future harm to [plaintiffs] as they progressed through their lives"].)

We are not persuaded by defendants' argument that the record "boils down to nothing more than, *if* an emergency occurs, and *if* McCarley is having a bad day, she *might* not be able to look out for herself."  They suggest there would only be a problem in a "serious-enough emergency" like a "house fire."  This argument overlooks the other evidence supporting attendant care and discounts the emergency issue.  The jury could reasonably conclude that, in addition to McCarley's other limitations, being unable to respond

25

consistently to urgent situations justifies attendant care—even if they never rise to the level of a fire.  She only had to establish harm " 'with as much certainty as . . . the circumstances permit.' " (*Clemente v. State of California* (1985) 40 Cal.3d 202, 219; see, e.g., *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 602 [where doctor opined plaintiff would likely need spinal surgery because condition increased likelihood of arthritic changes, uncertainty as to whether changes would develop did not bar finding that need for surgery was reasonably certain].)

Defendants also direct us to evidence that could counsel against future attendant care, including Dr. Colarusso's acknowledgment that he was unaware of lapses in judgment by McCarley where she did something dangerous or inappropriate, her mother's identification of a single time she left the stove on, and Dr. Lobatz's testimony that she could handle daily tasks.  They further note Dr. Delis highly disagreed she needed attendant care, and Dr. Max felt she could become independent.  Whether or not the jury could have relied on this evidence to reject damages for attendant care, it does not support reversal here.  (See *People v. White* (2014) 230 Cal.App.4th 305, 319, fn. 14 [witness testimony is "ordinarily sufficient to uphold a judgment 'even if it is contradicted by other evidence, inconsistent or false as to other portions' "].)

Finally, the cases cited by defendants involve damages that did rest on speculation, or are otherwise distinguishable.  (See, e.g., *Scognamillo v. Herrick* (2003) 106 Cal.App.4th 1139, 1145, 1151 [reversing award encompassing second surgery, where doctor testified procedure was to do first surgery, assess improvement, and "perhaps, if everything goes well," do second one; whether "second surgery will ever be performed could hardly have been couched in more speculative terms"], disapproved on other grounds

26

by *Lewis v. Ukran* (2019) 36 Cal.App.5th 886, 894-895; *Silvester v. Scanlan* (1933) 136 Cal.App. 107, 110-111 [reversing judgment for plaintiff who alleged "traumatic neurosis," where no witness was "certain [she] would suffer in the future"].)[6]

We recognize McCarley's need for future attendant care was strongly disputed by the parties. But the issue was for the jury, there was sufficient evidence to support their award, and we therefore affirm it.

IV. *Prejudgment Interest*

Finally, defendants contend prejudgment interest should be stricken because McCarley's section 998 offer would not have resulted in final disposition of the case as to Dr. Canada and was thus invalid. McCarley argues defendants forfeited this issue by relying on a different theory in the trial court, and the offer was valid regardless. We agree defendants forfeited the issue.

A. *Applicable law*

" 'A prevailing party who has made a valid pretrial offer pursuant to Code of Civil Procedure section 998 is eligible for specified costs, so long as the offer was reasonable and made in good faith.' " (*Najera v. Huerta* (2011) 191 Cal.App.4th 872, 877.) These amounts include prejudgment interest in a personal injury case "when a defendant refuses a plaintiff's [section 998] settlement offer and the plaintiff later recovers a more favorable judgment." (*Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1435, citing Civ. Code, § 3291.) The purpose of § 998 is to "encourage the settlement of

---

[6] Defendants also contend *Melone v. Sierra Railway Co.* (1907) 151 Cal. 113, 116-117 holds it is error to instruct the jury a plaintiff can recover for harm he "may suffer." They do not allege instructional error, and regardless, the instruction here required "reasonable certainty."

litigation without trial, by punishing the party who fails to accept a reasonable settlement offer from its opponent." (*Elite Show Services, Inc. v. Staffpro, Inc.* (2004) 119 Cal.App.4th 263, 268 (*Staffpro*).)

"Where the offeror obtains a judgment more favorable than its offer, . . . the burden lies with the offeree to show that the offer was not . . . reasonable. [Citation]. . . . [T]he offering party bears the burden of demonstrating that the offer was otherwise valid." (*Staffpro, supra*, 119 Cal.App.4th at p. 268.) Whether a section 998 offer is "sufficiently certain to be enforceable involves a question of law . . . ." (*Ibid*.; see *Berg v. Darden* (2004) 120 Cal.App.4th 721, 727, 731-732 [offer need not contain "magic language," but must be clear that acceptance "will result in the entry of judgment" or the equivalent].)

"Ordinarily, a party may not change the theory of his case for the first time on appeal." (*Frink v. Prod* (1982) 31 Cal.3d 166, 170 (*Frink*); *Cox v. Griffin* (2019) 34 Cal.App.5th 440, 453 [accord]; see *Ward v. Taggert* (1959) 51 Cal.2d 736, 742 (*Ward*) [rationale is that one should not have to defend new theory involving factual situation not addressed at trial].) While an appellate court may exercise its discretion to consider questions of law raised for the first time on appeal, it is not required to do so. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 (*Greenwich*).)

B.     *Additional Facts*

McCarley made her section 998 offer to Dr. Canada in March 2015, nine months after she filed her lawsuit. The offer stated:

> "Pursuant to California Code of Civil Procedure section 998 and Civil Code section 3291, [McCarley] hereby offers to compromise the above-entitled action in the amount of One Million Dollars ($1,000,000) for your several liability only and not for a discharge of any other Defendant's liability. [¶] Acceptance of this offer constitutes agreement that the sum paid shall afford only a deduction from any other Defendant's liability and not a discharge of such Defendant.

28

As part of said compromise and settlement, each side is to bear its own costs. [¶] If this offer is not accepted prior to trial or within thirty (30) days after it is made, whichever occurs first, it shall be deemed withdrawn."

As noted *ante*, defendants moved for a new trial following judgment. They argued in part that prejudgment interest should be stricken because the section 998 offer was "not presented in good faith and had no reasonable expectation of acceptance," based on the state of the evidence at the time. In her opposition, McCarley described significant discovery that had taken place by that point, and noted brain injury had not been ruled out.

Defendants also filed a motion to tax expert witness costs based on the section 998 offer. There, they stated McCarley "made a section 998 offer to compromise, offering to dismiss Defendant, Edgar Canada, M.D. in exchange for the payment of $1,000,000.00," and again argued the offer was not made in good faith or reasonable. McCarley opposed the motion, noting she gave defendants a chance "to settle the instant lawsuit as to [Dr. Canada] for his policy limit of $1,000,000" and "simultaneously offered to dismiss defendant [ASMG] for a waiver of costs, contingent on Dr. Canada's acceptance of [her] statutory offer to compromise." She later reiterated she had "offered to compromise this case, in its entirety as to both Defendants . . . ."

C.    *Analysis*

Defendants now contend the term "several liability" ordinarily means noneconomic damages, so McCarley's section 998 offer left Dr. Canada liable for joint and several liability—or was at least ambiguous—so it would not have resulted in final disposition of the case as to him and was thus invalid. McCarley argues defendants waived this argument, because they argued in the trial court only that the offer was unreasonable, and that it was clear she intended to fully settle with Dr. Canada. She further contends that, had they

29

raised this alleged ambiguity, she could have introduced a letter to defendants' counsel that accompanied the section 998 offer and "made clear that she would dismiss [ASMG] for a waiver of costs" if Dr. Canada accepted the offer.

We conclude defendants have forfeited their section 998 argument, and we decline to exercise our discretion to reach it. (*Greenwich*, *supra*, 190 Cal.App.4th at p. 767.) The issue is not simply that defendants failed to raise the argument in the trial court, although that is grounds for forfeiture. (See *Frink*, *supra*, 31 Cal.3d at p. 170; *Santantonio v. Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 113 (*Santantonio*) [deeming waived and declining to consider plaintiff's argument that defendant's section 998 offer was invalid because it purportedly required acceptance by all plaintiffs, where plaintiff argued below only that there was no unity of interest among defendants and the offer was not reasonable].)

Rather, defendants actually took a contrary position to their stance here, by acknowledging McCarley "offer[ed] to dismiss [Dr. Canada]" and arguing only that the offer was not in good faith or reasonable. Their approach left McCarley no reason to offer evidence, like a letter to defendants' counsel, to show her section 998 offer was intended to result in dismissal of Dr. Canada, and further supports forfeiture. (See *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 93 [declining to review forfeited contention "[g]iven that the parties did not develop the factual record below to allow for a fair review"]; cf. *Steller v. Sears, Roebuck & Co.* (2010) 189 Cal.App.4th 175, 183 [trial court should have considered extrinsic evidence to assess ambiguity in section 998 offer].) Defendants do not address the letter, and the authorities they cite are distinguishable. (See *Ward*, *supra*, 51 Cal.2d at p. 742 [theory did not contemplate "factual situation different from

30

that established by the evidence in the trial court"]; *Palmer v. Shawback* (1993) 17 Cal.App.4th 296, 300 [argument did not involve question of fact, and did rely on new cases].)

Under the circumstances, we will not exercise our discretion to reach defendants' newly raised section 998 argument. The purpose of section 998 is to promote settlement. (*Staffpro*, *supra*, 119 Cal.App.4th at p. 268.) "If the statutory purpose behind section 998 is to be served in this case, we cannot permit [appellant] to avoid the consequences of his decision by claiming now that the offer ought to be construed as one which he could not have accepted anyway." (*Santantonio*, *supra*, 25 Cal.App.4th at p. 114; cf. *Prince v. Invensure Ins. Brokers, Inc.* (2018) 23 Cal.App.5th 614, 623-624 [reversing order taxing costs, because section 998 offer whose scope was clarified in emails was not ambiguous; rejecting construction that would frustrate statutory purpose and allow defendant that declined "very reasonable settlement offer" to "assert a 'Gotcha!' defense," where it "knew exactly what [plaintiff] was offering"].)

## DISPOSITION

The judgment is affirmed.  Respondent shall receive her costs on appeal.


O'ROURKE, J.

WE CONCUR:


HALLER, Acting P. J.


DO, J.